[Cite as *State v. Elkins*, 2019-Ohio-2427.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

STATE OF OHIO,                          :
                                        :       Case No. 17CA14
        Plaintiff-Appellee,             :
                                        :
        vs.                             :       DECISION AND JUDGMENT
                                        :       ENTRY
WILLIAM ELKINS, Sr.,                    :
                                        :
        Defendant-Appellant.            :       **Released: 06/14/19**
_____

APPEARANCES:

Darren L. Meade, Columbus, Ohio, for Appellant.

Brigham M. Anderson, Lawrence County Prosecuting Attorney, and W. Mack Anderson, Lawrence County Assistant Prosecuting Attorney, Ironton, Ohio, for Appellee.
_____

McFarland, J.

{¶1} This is an appeal from a Lawrence County Court of Common Pleas judgment entry convicting Appellant, William Elkins, Sr., of aggravated murder with a firearm specification. The trial court sentenced Appellant to life in prison without the possibility of parole. On appeal, Appellant asserts the following: 1) the trial court abused its discretion when it allowed evidence that Appellant shot his son thirteen years ago because it had no relevance to any fact of consequence in the case and was intended only to show that Appellant had violent or aggressive tendencies; 2) he was

denied effective assistance of counsel in violation of the Sixth Amendment to the Constitution of the United States and comparable provisions of the Ohio Constitution because trial counsel failed to object to evidence of other bad acts contained in the recording of Appellant's conversation with the detective; 3) even if the court finds that the first and second assignments of error constitute harmless error on their own, the court should still rule in his favor because the errors in this case, taken together, have a cumulative effect of depriving Appellant of a fair trial; and, (4) his conviction for aggravated murder was against the manifest weight of the evidence because the State failed to prove that Appellant acted with prior calculation and design.

{¶2} With respect to Appellant's first assignment of error, although we find that the trial court abused its discretion in admitting other acts evidence of Appellant's prior shooting, we further find that this evidence did not result in prejudice to Appellant so as to require a new trial and, as such, the first assignment of error is overruled. With respect to Appellant's second assignment of error, we find that Appellant's counsel was not deficient in failing to object to the other acts evidence of the Georgia warrant or the drug investigation so as to result in ineffective assistance of counsel so this assignment of error is overruled. With respect to Appellant's third assignment of error, because there is no cumulative error, it is also

overruled.  Finally, with respect to Appellant's fourth assignment of error, we find that Appellant's conviction was not against the manifest weight of the evidence and this assignment of error is overruled.  Accordingly, we affirm the judgment of the trial court.

## PROCEDURAL HISTORY

{¶3}  In June of 2015, the State charged Appellant with aggravated murder that included a firearm specification.[1]  On April 16, 2016, Appellant agreed to plead guilty to voluntary manslaughter with a firearm specification.  However, at the sentencing hearing he requested to withdraw his plea.  The trial court informed Appellant the request should have been in writing, and then sentenced Appellant to eleven years for voluntary manslaughter and three years for the firearm specification, to be served consecutively.

{¶4}  On appeal, we reversed the trial court's judgment to the extent that it overruled Appellant's request to withdraw his plea and remanded the matter with instructions to conduct a hearing that complied with due process standards. *See State v. Elkins*, 4th Dist. Lawrence No. 16CA15, 2016-Ohio-8579.  On February 6, 2017, the trial court granted Appellant's motion to withdraw his plea.  The court also restored the original indictment, finding

---

[1] The procedural history of this case is taken from our decision in *State v. Elkins*, 4th Dist. Lawrence No. 16CA15, 2016-Ohio-8579, as supplemented by the trial transcript.

that it had been dismissed based on the parties' agreement that Appellant

pleaded guilty to voluntary manslaughter.

TRIAL

{¶5}  At Appellant's July 2017 jury trial, Terry Elkins ("Elkins"),

Appellant's wife, testified that she and Appellant had been married for 21

years and that she had known the victim, Rick Crager, as long as she had

known her husband.  Elkins testified that several weeks before Appellant

shot and killed Crager, while she, Crager, and Appellant were at Appellant's

home, she had performed oral sex on Appellant and then on Crager, and that

afterwards Crager slept overnight with her and Appellant in their bed.

{¶6}  Elkins testified that on May 15, 2015, she was home alone when

she texted Crager asking him to bring some weight loss pills, which she said

was a stimulant.  Elkins testified that she was drunk when Crager arrived

and stated that she texted Appellant, who was fishing, and asked him to

come home because Crager was coming over.  She testified that both she

and Crager texted Appellant to come home.  After not getting any response

from Appellant, Elkins texted Appellant that she was going to have sex with

Crager.  However, she testified that because she was drunk she had no

independent recollection of whether she had sex with Crager or not.  Elkins

testified that Appellant responded, texting: "I'm going to come home and

kill you both." Elkins testified that she blacked out on the porch until Appellant arrived home. Elkins testified that she and Crager were on the porch when she saw Appellant approaching with a gun in his hand, which was pointed at Crager, who was standing behind Elkins. She testified that Appellant shot under her arm at Crager, then shot Crager again, and then when Elkins attempted to grab the gun, fired a third shot in the air. She testified that Appellant walked into the house, retrieved another gun, and said "I'm going to take him out and then when I'm done with him I'm coming after you." Elkins then called 911.

{¶7} On redirect, the prosecutor asked Elkins if it was the first time that Appellant shot someone in their home. Appellant's counsel objected, but the court summarily overruled the objection and provided no limiting instruction. Elkins then testified that thirteen years ago Appellant and his son, Willie, got into an argument after Willie caused "quite a bit of commotion." Elkins said that Appellant "told his son * * * 'if you don't think I won't shoot you in the ass you've got another thing coming,' and after Willie kept 'pushing [Appellant's] buttons,' Appellant said 'I'll take you and your whore wife too outside and beat the hell out of both of you.' " Elkins testified that Appellant then went and "got his .38 and stepped into

the kitchen while Willie was getting him a glass of tea and he shot Willie in the butt."

{¶8} Lawrence County Sheriff's Deputy Timothy Bryant testified that on May 15, 2015, he responded to a shooting at Appellant's home. When he arrived he saw a body on the front porch, who he later determined was Crager, and then saw Appellant inside the house with a hand gun. After deputies apprehended Appellant, they retrieved the hand gun that Appellant had tossed on the porch, another hand gun in Appellant's back pocket, a knife, and some marijuana. Deputy Bryant testified that they found Elkins locked in the bathroom.

{¶9} Proctorville Police Officer Randy Thompson testified that he helped secure Appellant. Officer Thompson testified that when he asked Appellant to identify the body, Appellant told him it was Crager. Appellant also told Officer Thompson: "What would you do if you came home and found someone fucking your wife?"

{¶10} Lawrence County Detective Aaron Bollinger testified that he spoke to Appellant after he had been arrested and hand cuffed. Detective Bollinger read Appellant his *Miranda* rights, and Appellant signed a waiver of his rights as well. Detective Bollinger testified that the evidence indicated that Appellant shot Crager in the arm, then, after the gun jammed and

Appellant cleared the chamber, he shot the victim in the chest.  Detective

Bollinger testified that neither Appellant nor Elkins were bleeding, although

Elkins had some blood on her shirt.

{¶11} Detective Bollinger also detailed the chronology and content of

the text messages exchanged between Appellant, Elkins, and Crager on May

15, 2015.  At the time Elkins sent the first text, Appellant was fishing about

25 minutes from home and Elkins was at home.

- 7:56 p.m. Elkins to Appellant: Hi habibi! (wife's name for Appellant) can rick (Crager) come out here an talk to us? really hep c he needs to

- 8:06 p.m. Elkins to Crager: please come by house.  I won't let you down.  I'm saying please, but it's please p-l-e-z. xoxoxoxox.

- 8:27 p.m. Elkins to Crager: Rick please join me xoxo

- 8:35 p.m. Elkins to Appellant: (same message as previously sent to Appellant) Hi habibi! can rick come out here an talk to us? really hep c he needs to

- 8:39 p.m. Elkins to Appellant: ? he said he was drunk don't think he will make it really!

- 9:22 p.m. Crager to Appellant: Im at ur house

- 9:27 p.m. Elkins to Appellant: rick here, we havin sex k?

- 9:27 p.m. Appellant to Elkins: i don't like it at all im still fish'n damnit

- 9:29 p.m. Elkins to Appellant: To late im doin it

- 9:30 p.m. Appellant to Elkins: no godam'it! I kill the both of u!!

- 9:32 p.m. Appellant to Elkins: hey motherfuckers

- 9:34 p.m. Appellant to Elkins: no mothers

- 9:34 p.m. Appellant to Elkins: anser me dam u!!

- 9:36 p.m.  Appellant to Elkins: I kill u both

- 9:37 p.m. Elkins to Appellant: To late we r alredy waitin on u

{¶12}  Dr. Donald Pojman, Deputy Coroner and Forensic Pathologist at the Franklin County Coroner's Office, testified that Crager had three gunshot wounds from two separate bullets.  Dr. Pojman testified that one bullet went through the back of Crager's right forearm, just behind the wrist. Another bullet entered the center of the chest and stayed within the sternum. Dr. Pojman testified that it appeared that the bullet that went through the arm is the same one that struck the chest, and it would not have caused incapacitation or death.  Another gunshot wound entered on the left side of the chest near the armpit and struck the left lung, the left side of the heart, the right lung and then stopped just underneath the skin on the right side. Dr. Pojman testified that that was what ultimately caused Crager's death.

{¶13}  At the end of the State's case, the defense made a Crim.R. 29 motion to dismiss, which the court overruled.  Appellant testified on his own behalf and explained that he met Crager when he was probably 12 years old and they played guitar and fished together.  Appellant stated that

approximately three to four weeks prior to May 15, 2015, Crager was at his home and Appellant and Crager were playing music and drinking pretty heavily. Appellant explained that Elkins had fixed dinner and they ate and watched videos on TV while Elkins put the dishes away. Appellant stated that first they were watching an Eagles music video and then they watched a pornographic movie. Appellant testified that Elkins came into the living room and they all sat on the couch together and watched the movie and drank more.

{¶14} Appellant testified that he and Elkins started kissing and "the next thing I know she was giving me oral sex" while Crager was sitting next to them on the couch. Appellant stated that Elkins asked "what about your friend?" and then Crager stood up and unfastened his pants and Elkins "started giving him oral sex, as well." Appellant testified that all three went into the bedroom and went to sleep.

{¶15} On cross-examination, Appellant also admitted that Elkins wanted Crager to have vaginal intercourse with her that same evening, but Crager was unable to maintain an erection. Appellant said the next day and after that, the three did not talk about what occurred and no other sexual acts occurred between the three of them. Appellant stated that he and Crager played music and fished together several times after that.

{¶16} Appellant testified that on May 15, 2015, he was fishing with his son and a friend, and his phone was in his Jeep. Around 8:45 p.m., Appellant stated that he was getting a beer out of his vehicle when he picked up his phone and saw the messages. Appellant stated that Elkins knew he did not like another man being at his home when he was not there and he said his text message saying "I'll kill you both" was an attempt to try to "scare the two of them and get him to leave." Appellant explained that he packed up his fishing gear, stopped and got gas, and drove home.

{¶17} Appellant testified that when he got home, Elkins and Crager were on the front porch and they were both naked and "appeared to be engaged in the sex act on the porch." Appellant stated that he fired twice into the air to try to scare them and the gun jammed. He said he "slid the slide back and put another shell in the chamber." Appellant said when he saw the two of them on the porch "I was just beside myself. I just totally lost it." Appellant said he told Elkins and Crager, "I told you mother fuckers what I was going to do." Appellant stated that he pointed his gun "in Rick's direction" and his wife "jumped up and grabbed my gun and the gun went off and she shoved the gun up in the air and it went off the second time. * * * Rick fell back on the porch."

{¶18} When cross-examined about why Appellant's version of events at trial was different than his statement to police on the night of the crime, Appellant stated that at the scene he was under the influence of whiskey and Xanax, which he had taken after the crimes. On cross-examination, Appellant also admitted that on the night of the murder he told Detective Bollinger that he didn't know if he made the right decision "by not letting her be with him." When asked what that meant, Appellant had explained to Detective Bollinger, "I said um, if they was going to be together they can be in hell together." The State also pointed out that Appellant had told Detective Bollinger that the night of the murder Appellant had four 10oz beers, but told the jury he had five Xanax and a quarter of a fifth of whiskey. Appellant also admitted that there were two other occasions when he and Elkins engaged in sexual activity with other females.

{¶19} At the end of the defense's case, defense counsel asked the court for an instruction on the lesser-included offense of reckless homicide, which the court overruled. The jury convicted Appellant of aggravated murder with a firearm specification and the trial court sentenced Appellant to life in prison without the possibility of parole plus one year for the firearm specification. This appeal followed.

ASSIGNMENTS OF ERROR

I.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED EVIDENCE THAT APPELLANT SHOT HIS SON THIRTEEN YEARS PRIOR TO TRIAL BECAUSE IT HAD NO RELEVANCE TO ANY FACT OF CONSEQUENCE IN THE CASE AND WAS INTENDED ONLY TO SHOW THAT APPELLANT HAD VIOLENT OR AGGRESSIVE TENDENCIES.

II.    APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE TRIAL COUNSEL FAILED TO OBJECT TO EVIDENCE OF OTHER BAD ACTS CONTAINED IN THE RECORDING OF APPELLANT'S CONVERSATION WITH THE DETECTIVE.

III.    EVEN IF THE COURT FINDS THAT THE FIRST AND SECOND ASSIGNMENTS OF ERROR CONSTITUTE HARMLESS ERROR ON THEIR OWN, THE COURT SHOULD STILL RULE IN FAVOR OF APPELLANT BECAUSE THE ERRORS IN THIS CASE, TAKEN TOGETHER, HAVE A CUMULATIVE EFFECT OF DEPRIVING APPELLANT OF A FAIR TRIAL.

IV.    APPELLANT'S CONVICTION FOR AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE STATE FAILED TO PROVE THAT APPELLANT ACTED WITH PRIOR CALCULATION AND DESIGN.

FIRST ASSIGNMENT OF ERROR

{¶20} In his first assignment of error, Appellant contends the trial court abused its discretion when it allowed Elkins to testify that Appellant had shot his son thirteen years ago contrary to Evid.R. 404(B). Appellant

argues that this evidence does not fit within any of the exceptions listed in Evid.R. 404(B) and was improperly admitted to show that Appellant had a propensity for violence, and therefore was prejudicial because it could persuade the jury that Appellant was a violent person who intentionally shot Crager.

{¶21} In response, the State argues Appellant asserted that the shooting was a mistake in that Elkins "hit Appellant's arm and caused the gun to go off." Therefore, the State argues, the evidence of the prior shooting was admissible under Evid.R. 404(B) to prove that Appellant's shooting of Crager was not an accident.

{¶22} Ohio Evid.R. 402 states that "[a]ll relevant evidence is admissible," subject to certain exceptions in the law, including those provided in other rules of evidence. Ohio Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as * * * absence of mistake or accident." *See also* R.C. 2945.59. A trial court has broad discretion in deciding whether to admit or exclude other-acts evidence. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554,

¶ 110, citing *State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67. Nevertheless, courts must remember that "[b]ecause R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682 (1988), citing *State v. Burson* , 38 Ohio St.2d 157, 158-159, 311 N.E.2d 526 (1974), *State v. DeMarco*, 31 Ohio St.3d 191, 194, 509 N.E.2d 1256 (1987). When the purpose of evidence of other acts is to show the absence of mistake or accident on the part of the defendant in committing the offense charged, it must be shown that a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of a similar nature. The other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question. The evidence is then admissible to the extent it may be relevant in showing the defendant acted in the absence of mistake or accident. *State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974), citing *State v. Moore*, 149 Ohio St. 226, 78 N.E.2d 365 (1948).

**{¶23}**  "This [three-part] requirement merely represents the common sense conclusion that an act too distant in time or too removed in method or type has no permissible probative value to the charged crime." *State v. Morris*, No. 88-06-081, 1989 WL 11510, at *4 (Ohio Ct. App. Feb. 13, 1989), quoting *State v. Snowden* (1976), 49 Ohio App.2d 7, 10.

**{¶24}**  However, even if a court abuses its discretion by improperly admitting other acts evidence at trial, the court's decision is still subject to a harmless error analysis. *State v. Morris*, 2014-Ohio-5052, ¶ 23, 141 Ohio St.3d 399, 405, 24 N.E.3d 1153, 1158, *State v. Ruble*, 4th Dist. Washington No. 16CA20, 2017-Ohio-7259, 96 N.E.3d 792, 801, ¶ 31.  Crim.R. 52(A) defines harmless error as: "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  "[T]he real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result.  If not, the error may be disregarded as harmless error." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25.

**{¶25}** In order to determine when a defendant's substantial rights are affected the Supreme Court of Ohio set forth a tripartite analysis that guides courts that are determining whether error amounts to harmless error: First, it must be determined whether the defendant was prejudiced by the error, i.e.,

whether the error had an impact on the verdict.  Second, it must be determined whether the error was not harmless beyond a reasonable doubt.  Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *State v. Butcher*, 4th Dist. Athens No. 15CA3, 2017-Ohio-1544, ¶ 51, citing *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25, 27, 28, 29, 33.

{¶26} "The State has the burden of proving that the error did not affect the substantial rights of the defendant," i.e. the error was harmless. *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23 citing *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15.

{¶27} We find the following portions from the testimony and evidence pertinent in determining whether the trial court abused its discretion in permitting the State to elicit from Elkins Appellant's prior shooting of his son.

{¶28} Direct examination by the prosecutor:

Q: Okay tell me what happened when [Appellant] came to the porch and he had the gun in his hand?

A: Um, I really can't remember.  Much other than I was trying to get the gun out of [Appellant's] hand because he kept pointing it at [Crager].  I was trying to reach for it to grab it."

Q: Where was [Crager]?

A: Behind me.  He was using me as a human shield.

Q: Okay.  And did [Appellant] fire a shot at [Crager]?

A: Yes, he did. He went underneath my arm . . .

Q: Would you stand up so we can see.

A: He went this way with the gun.

Q: Who's he?

A: [Appellant].

Q: Okay.

A: Cause I couldn't reach it.  And when my arm was up he came down and he shot the gun * * *.

{¶29} Cross examination of Elkins by Defense Counsel:

Q: Rick was using you as a human shield, correct?

A: Um, um.

Q: And you were trying to fight the gun away from [Appellant]?

A: I was . . . yes. . .

Q: Correct?  Okay, so you were wrestling to get it away, or trying to?

A: Where his . . . wherever his hand kept going I went.  He kept moving it out of the way so I couldn't grab it.

{¶30} Re-Direct Examination by the Prosecutor:

Q: You never got the gun away from [Appellant], did you?

A: No, sir.

Q: Alright.  So when you're being crossed [*sic*] examined there it wasn't that you were wrestling the gun away from [Appellant].

A: I was trying to get the gun from [Appellant].

Q: I understand you were trying to keep him from shooting [Crager], right?

A: Right.

Q: Alright, but you did not actually get the gun at any point?

A: No sir.

Q: Alright, so your hands weren't on the gun struggling?

A: Not at all.

Q: This wasn't some accidental shooting was it?

A: No.

Q: [Appellant] intentionally was shooting at [Crager]?

A: Yes.

Later during the Prosecutor's Re-Direct Examination of Elkins, the following exchange occurred:

Q: And on May 15, [Appellant] was shooting at [ ] Crager, correct?

A: Yes.

Q: Is this the first time that [Appellant] ever shot someone at your home?

Defense Attorney: Objection your honor.  Irrelevant.

Prosecutor:  Your honor 404(B), goes to lack of accident, in Defendant's opening statement in questioning [Elkins] he's trying to indicate to the jury that this was some sort of accident. This was a prior act of the defendant. That was also intentionally done and I believe it's completely admissible in Court.

Defense Attorney: Prejudicial effect your honor is going to [*sic*] far outweigh any probative value to this. That's totally irrelevant to this case.

Court: Overruled, I'm going to allow it.

**{¶31}** Elkins was then permitted to testify that Appellant had shot his son thirteen years earlier.

**{¶32}** While Appellant's counsel claimed in opening argument that this shooting was either reckless or negligent, but not intentional, there was simply no evidence or testimony from Elkins that she ever touched the gun or otherwise caused Appellant to accidently discharge his gun.  On multiple occasions, she testified that she was never able to physically touch the gun. Moreover, just prior to asking Elkins about Appellant's prior shooting on re-direct examination, the prosecutor had just elicited testimony from her stating that Appellant's shooting of Crager was in fact not accidental, but was intentional.

**{¶33}** Accordingly, we find no evidence or testimony had been introduced, let alone admitted, that could be construed as indicating that

Appellant's shooting of Crager was accidental, prior to the prosecutor asking Elkins about Appellant's prior shooting of his son. Absent such evidence, there was no basis under Evid.R. 404(B) for the trial court to admit the prior shooting as evidence that Appellant did not accidently shoot Crager in this case.

{¶34} Moreover, Appellant shot his son 13 years prior to Appellant's shooting of Crager. Therefore, we find also that this incident is too remote in time from the current shooting. *See generally State v. Wright*, 4th Dist. Washington No. 00CA39, p. 15, quoting *Snowden,* 49 Ohio App.2d at 10, 359 N.E.2d at 91. ("A prior act which is * * * too distant in time or too removed in method or type has no permissible probative value.").

{¶35} For the aforementioned reasons, we find that the trial court abused its discretion in overruling Appellant's objection to Elkins testifying about Appellant's shooting his son 13 year ago.

{¶36} However, that does not end our analysis. We must still determine whether the admission of the prior shooting was nevertheless harmless error.

{¶37} Under the first prong of the *Morris* test, we find nothing in the "record" that affirmatively indicates that the jury verdict was impacted by the admission of the prior acts evidence. *Morris*, 141 Ohio St.3d 399, 406,

2014-Ohio-5052, 24 N.E.3d 1153, ¶ 27. Moreover under the second and third prongs of the *Morris* test, we are persuaded beyond a reasonable doubt that the error was harmless, because irrespective of Appellant's prior shooting, there is overwhelming evidence supporting Appellant's aggravated murder conviction. *Id*., at ¶ 29, citing *State v. Rahman,* 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986).

{¶38} Notably, we begin with the Appellant's text message expressly threatening to kill both Crager and his wife after Appellant learned they were having sex. In fact, he reiterated that he would kill them both later, in a second text message. And despite having time to contemplate his threat during the approximately 20-minute drive home from his fishing expedition, when he arrived, he exited his vehicle, drew his handgun from his pocket and proceeded to shoot Crager, not once, but twice, despite pleas from Elkins and Crager for Appellant to not shoot.

{¶39} Appellant testified explaining that his text threatening to kill Crager and his wife was merely intended to scare them. Yet, on cross examination, Appellant admitted that while Crager was "pleading for his life," Appellant said "I told you mother fuckers what I was going to do." This admission bolsters that the initial threat to kill both Crager and Elkins was indeed a threat, and not just an attempt to scare them.

{¶40} This conclusion is also supported by Elkins' testimony that Appellant was pointing the gun at Crager and that the shooting was not an accident, but rather an intentional act.

{¶41} Accordingly, because the admission of the other acts evidence was harmless in light of the overwhelming evidence that Appellant acted with prior calculation and design beyond a reasonable doubt in shooting Crager, Appellant's first assignment of error is overruled.

SECOND ASSIGNMENT OF ERROR

{¶42} In his second assignment of error, Appellant asserts that he was denied effective assistance of counsel in violation of the Sixth Amendment to the Constitution of the United States and comparable provisions of the Ohio Constitution because trial counsel failed to object to evidence of other bad acts contained in the recording of Appellant's interview with the detective. Specifically, Appellant alleges that during Detective Bollinger's questioning of Appellant regarding the Crager shooting, Appellant alluded to a previous discussion with a sheriff's deputy about Appellant's firearm collection and a drug investigation of Appellant.

{¶43} "To establish constitutionally ineffective assistance of counsel, an accused must establish that (1) his counsel's performance was deficient, and (2) such deficient performance prejudiced the defense and deprived the

accused of a fair trial." *State v. Jensen*, 4th Dist. Pickaway No. 07CA21, 2008-Ohio-5228, ¶ 8, citing *Strickland v. Washington*, 466 U.S. 668, 687, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).

**{¶44}** "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 66, quoting *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶ 95. Courts may not simply assume the existence of prejudice, but must require the defendant to affirmatively establish prejudice. *State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, 2003 WL 1756101, ¶ 22, citing *State v. Tucker,* 4th Dist. Ross No. 01CA2592, 2002 WL 507529 (Apr. 2, 2002). "Failure to establish either element is fatal to the claim." *State v. Fox*, 4th Dist. Washington No. 14CA36, 2015-Ohio-3892, ¶ 28, citing *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008–Ohio–968, ¶ 14.

**{¶45}** "When considering whether trial counsel's representation amounts to deficient performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.' " *State v. Adams*, 4th Dist. Lawrence No. 15CA2, 2016-Ohio-7772, ¶ 90, citing *State v. Pickett,* 4th Dist. Athens No. 15CA13, 2016-Ohio-4593, 2016 WL 3483653, ¶ 38, quoting *Strickland v. Washington,* 466 U.S. 668, 689, 80 L.Ed.2d 674, 104 S.Ct. 2052.  A trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance. *State v. Teets*, 4th Dist. Pickaway No. 16CA3, 2017-Ohio-7372, ¶ 71, citing *State v. Roby*, 3rd Dist. Putnam No. 12-09-09, 2010-Ohio-1498, ¶ 44; *State v. Eason*, 7th Dist. Belmont No. 02 BE 41, 2003-Ohio-6279, ¶ 133 (finding trial counsel's failure to object to a potential *Doyle* violation fell within the gambit of trial strategy), *see also State v. Foust*, 105 Ohio St.3d 137, 153, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 93.  " ' 'A competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material.' ' " *Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 70, quoting *State v. Topping,* 4th Dist. Lawrence No. 11CA6, 2012-Ohio-5617, ¶ 80; quoting *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90; quoting *United States v. Payne,* 741 F.2d 887, 891 (7th Cir. 1984), *see also State v. Franklin,* 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 42 (stating that "[a] reasonable attorney may decide not to interrupt his adversary's argument as a matter of strategy"); *State v. Clay,* 7th Dist.

Mahoning No. 08MA2, 2009–Ohio–1204, ¶ 141 (stating that [l]imiting objection during closing is a trial tactic to avoid trying to draw attention to the statements.").

{¶46} Appellant complains that his trial counsel failed to object to Appellant's references to a Georgia warrant for his arrest and to an investigation into Appellant regarding illicit drug activity under Evid.R. 404(B). In order to understand the context in which these issues were discussed, we cite the relevant portions from the transcript of Detective Bollinger's questioning of Appellant.

{¶47} During the interview, Appellant, on his own initiative, brought up that he was concerned how the news would talk about his firearm collection. Later in the interview, Appellant also brought up the drug investigation.

{¶48} After Detective Bollinger handed Appellant a consent-to-search-property form, the following conversation occurred:

> Appellant: You're probably going to look through it anyway. The reason I was telling you about the guns was I probably had what they would call a small arsenal in there. Cause I had some shells . . .

> Bollinger: That doesn't shock me at all, okay Bill? I've got a lot of friends that have a small arsenal.

Appellant: I live up here on a hill.  I got four and a half acres and my house is situated in about the middle of it.  Which allows me to not have any neighbors.  And I like it that way.

Bollinger: It's nice to have some privacy.

Appellant: Well I go out and shoot my guns whenever I want to.  And Jeff Lawless was here and told me personally, he said you can shoot as many guns as you want to.  And I told him that there's a pistol in my glove box and he said, I don't have a problem with that but he said, *what I do have a problem with, he said they have a warrant out for your arrest in the state of Georgia*.  When I went to get one of my guns back from Mack & Dave's where I pawned it, they denied me to have my gun back.  They said I was a . . . (Emphasis added.)

Bollinger: Because of the warrant?

Appellant: . . . fugitive from justice, and that they had transferred from Georgia to Ohio.  And Sheriff Lawless told me, he said, cause I was in the house.  He come to the front door.  If I'd been doing anything wrong would I have said come on in?

Bollinger: No. No.

Appellant: I said come on in.  He come inside and I told him, you know, I said I think I know what you're here about.  He said what's that?  I said it's about that damn loitering ticket from Georgia.  And he said no, that's not what I'm here about.  He said *I'm here to inquire about your suspicious traffic and drug activity in your home*.  With an anonymous letter.  I'm pretty sure I know where that letter come from.  But . . . (Emphasis added.)

Bollinger: It wasn't true right?

Appellant: Pardon me?

Bollinger: It wasn't true right?

Appellant: At one time it was.

{¶49} The discussion regarding the warrant and the sheriff's

investigation are topics that are not probative of Appellant's aggravated

murder charge. However, while both address possible violations of the law

by Appellant, one is for loitering and the other merely discusses an

investigation. And neither addresses a violent offense. Moreover, neither

issue was elicited by Detective Bollinger's questioning. Rather, Appellant

raised these issues on his own. Most importantly however, we presume that

Appellant's counsel purposely failed to object to either to avoid unnecessary

attention to relatively innocuous issues. *Canterbury*, 4th Dist. Athens No.

13CA34, 2015-Ohio-1926, ¶ 70.

{¶50} However, even if we had concluded that Appellant's counsel

was deficient for failing to object to these issues, we find the language in

*State v. Twitty*, 2002-Ohio-5595, ¶ 99, instructive:

> "Even assuming arguendo that defense counsel performed
> deficiently by failing to object to some of the unnecessary
> and highly emotional testimony discussed in the fourth
> assigned error, given the overwhelming evidence of
> Defendant's guilt on these offenses, we cannot say that but
> for defense counsel's failure to object there is a reasonable
> probability that the outcome of this trial would have been
> different. No prejudice has been demonstrated."

{¶51} Similar to *Twitty*, we find that even if Appellant's counsel's

failure to object to Appellant's references to the Georgia warrant and the

drug investigation was deficient, it was nevertheless insufficient to result in prejudice because of the overwhelming evidence of Appellant's guilt that we reviewed in resolving Appellant's first assignment of error.

{¶52} Accordingly, Appellant's second assignment is overruled.

### THIRD ASSIGNMENT OF ERROR

{¶53} In his third assignment of error, Appellant asserts that even if the court finds the first and second assignments of error harmless on their own, the court should still rule in favor of Appellant because the errors in this case, taken together, have the cumulative effect of depriving Appellant of a fair trial.

{¶54} Pursuant to Appellant's first proposition of law, we held that the trial court abused its discretion in permitting Elkins to testify about Appellant shooting his son 13 years ago, but we held that it was harmless error because it did not result in prejudice to Appellant.  However, pursuant to Appellant's second assignment of error, we held that his trial counsel was not deficient for failing to object to Appellant's references to the Georgia warrant for his arrest and regarding the drug investigation.  Accordingly, because there is no cumulative error, Appellants' third assignment of error is overruled.

APPELLANT'S FOURTH ASSIGNMENT OF ERROR

{¶55} In Appellant's fourth assignment of error, he asserts that his conviction for aggravated murder was against the manifest weight of the evidence because the State failed to prove that he acted with prior calculation and design in killing Crager.

{¶56} In considering whether a verdict is against the manifest weight of the evidence, "a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "[A] reviewing court's duty is to weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether the trier of fact clearly lost his or her way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Garrow*, 103 Ohio App.3d 368, 370-371, 659 N.E.2d 814 (4th Dist.1995), citing *State v. Brown* , 38 Ohio St.3d 305, 528 N.E.2d 523(1988), *see, also, State v. Banks*, 78 Ohio App.3d 206, 604 N.E.2d 219 (1992); *State v. Martin*, 20 Ohio App.3d 172,  485 N.E.2d 717 (1st Dist.1983).

{¶57} "The reviewing court sits, essentially, as a 'thirteenth juror' and may disagree with the fact finder's conclusions regarding conflicting testimony during trial." *State v. Varney*, 4th Dist. Hocking Nos. 07CA19,

07AP19, 2008-Ohio-4038, ¶ 20, citing *State v. Thompkins,* 78 Ohio St.3d

380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997). " 'However, this review is

tempered by the principle that questions of weight and credibility are

primarily for the trier of fact.' " *Id*., quoting *Garrow* at 371, 659 N.E.2d 814.

{¶58} "If the prosecution presented substantial evidence upon which

the trier of fact could reasonably conclude, beyond a reasonable doubt, that

the essential elements of the offense had been established, the judgment of

conviction is not against the manifest weight of the evidence." *State v.*

*Picklesimer*, 4th Dist. Pickaway No. 14CA17, 2015-Ohio-1965, ¶ 8, citing

*State v. Eley,* 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus. " ' 'A

reviewing court should find a conviction against the manifest weight of the

evidence only in the 'exceptional case in which the evidence weighs heavily

against the conviction.' ' " *State v. Taylor*, 4th Dist. Ross No. 13CA3419,

2016-Ohio-1231, 62 N.E.3d 591 ¶ 31, quoting *State v. Thompkins,* 78 Ohio

St.3d at 387, quoting *Martin,* 20 Ohio App.3d at 175.

{¶59} In an aggravated murder case, the State must prove a defendant

acted with "prior calculation and design" in killing the victim. R.C. 2903.01.

"There is no 'bright-line test that emphatically distinguishes between the

presence or absence of prior calculation and design.' Instead, each case

turns on the particular facts and evidence presented at trial." *State v. Walker*,

150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124 (2016), ¶ 20, citing *State v. Taylor,* 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997), *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439 (2003), ¶ 61, *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, (2014), ¶ 148.  The Supreme Court "traditionally [has] consider[ed] three factors in determining whether a defendant acted with prior calculation and design: '(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *Taylor*, 78 Ohio St.3d at 19, quoting *State v. Jenkins,* 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).  "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Phillips*, 4th Dist. Scioto No. No. 18CA3832, 2018-Ohio-5432, ¶ 28, citing *Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.2d 1124, ¶ 18.

{¶60} Appellant and Crager had known each other since childhood. When Appellant read his wife's text that "[Crager] here, we havin sex k?," Appellant responded: "I don't like it at all im still fish'n damit."  Based on Appellant's text, there was strain between Appellant and Crager.

Appellant's wife then responded "to [*sic*] late im doin it." Appellant's

response elevated to an expressed threat: "no godam'it! I kill the both of u!!"

When his wife did not respond, Appellant followed with: "hey

motherfuckers" and later with "anser [*sic*] me dam u!!" Appellant also sent

another text that he was going to kill both of them. At this point, at least

from Appellant's perspective, the relationship between Appellant and Crager

was stressed to the point of Appellant threatening to kill Crager and his wife.

{¶61} Moreover, Appellant had sufficient time during his

approximate 25-minute drive home from fishing to contemplate his threat to

kill, yet when he arrived at his house he carried out that threat – by drawing

his gun, approaching the porch, and shooting Crager twice.

{¶62} We hold that this evidence is sufficient to constitute prior

calculation and design under R.C. 2903.01. *See State v. Phutseevong*, 2005-

Ohio-1031, ¶ 30 ("The defendant's decision to shoot [the victim], although

quickly conceived, was sufficiently removed in time from the threats and

confrontations * * * to permit prior calculation and design.").

{¶63} Therefore, we find that the jury did not lose its way in

concluding that Appellant acted with prior calculation and design in

shooting Crager, so Appellant's conviction for aggravated murder is not

against the manifest weight of the evidence.  As such, Appellant's fourth

assignment of error is overruled.

{¶64}  Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED**.

Abele, J., dissenting:

{¶65} I respectfully dissent. Although I agree with the principal opinion that the trial court erred by improperly admitting evidence of a prior bad act, I cannot agree with the majority that the admission of that evidence had no impact on the verdict and did not prejudice the appellant. Thus, I cannot conclude that the trial court's admission of the prior act evidence constitutes harmless error. Therefore, I believe that the judgment must be reversed and the matter remanded for a new trial.

{¶66} In the early stages of the trial court proceeding, appellant, pursuant to an agreement with the prosecution, pled guilty to a charge of voluntary manslaughter. After his plea, appellant received an eleven year prison sentence in addition to three years for a gun specification. Appellant, for some reason, subsequently opted to withdraw his guilty plea and proceed to trial. After the jury heard all the evidence, including prior bad act evidence of a violent act directed at appellant's son some thirteen years before the trial (and admitted with no limiting instruction and used to show appellant's violent character), the jury found appellant guilty of the offense of aggravated murder. The trial court thereupon sentenced appellant to serve life in prison without the possibility of parole, plus one year for the firearm specification.

**{¶67}** In the case sub judice the paramount issue was the defendant's state of mind, as it relates to the offense of voluntary manslaughter. After hearing the evidence, the jury had to determine whether the appellant, at that time he committed the offense, was under the influence of sudden passion or in a sudden fit of rage. Here, however, the jury also heard improper prior bad act evidence that may have clouded the issue. As this Court noted in *State v. Goff,* 4th Dist. Lawrence No. 11CA20, 2013-Ohio-42, ¶ 46:

> "A defendant on trial for murder or aggravated murder bears the
> burden of persuading the fact finder, by a preponderance of the
> evidence, that he or she acted under the influence of sudden
> passion or in a sudden fit of rage, either of which was brought
> on by serious provocation occasioned by the victim that was
> reasonably sufficient to incite the defendant into using deadly
> force, R.C. 2903.03(A), in order for the defendant to be
> convicted of voluntary manslaughter rather than murder."

This determination is to be made using an objective standard. *Goff* at ¶ 50. For example, we have explained that " '[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.;* quoting *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 81. If the objective

component is satisfied, the inquiry then "shifts to the subjective component, which considers whether this particular actor, in this particular case, was actually under the influence of sudden passion, or was in a sudden fit of rage. *Goff* at ¶51; citing *Shane* at 634.

{¶68} Here, the prosecution used prior bad act evidence to show the appellant's violent character. In general, the admission into evidence of prior bad acts can be very problematic. As the Sixth District noted in *State v. Clemons,* 6th Dist. Lucas No. L-16-1136, 2017-Ohio-7980, at ¶ 15:

> "Ohio has long recognized the dangers presented by admitting other acts evidence in criminal prosecutions. These include '[t]he overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts' and 'the tendency to condemn not because * * * [the defendant] * * * is believed guilty of the present charge but because he has escaped punishment from other offenses.' " *State v. Clemons,* 6th Dist. Lucas No. L-16-1136, 2017-Ohio-7980, at ¶ 15, quoting *State v. Curry,* 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). The risk is "particularly high when the other acts are very similar to the charged offense or of an inflammatory nature." *State v. Miley,* 5th Dist. Richland Nos. 2005-CA-67

and 2006-CA-14, 2006-Ohio-4670, ¶ 15.

{¶69} I recognize, of course, the damning nature of the text messages that the appellant sent in response to his spouse's taunts. However, when the appellant arrived home and found his spouse and friend on the porch, sans clothing and engaged in relations, it is arguable that a person in that situation could find themselves under the influence of sudden passion or a sudden fit of rage. After the jury heard the improper evidence regarding the appellant's thirteen year old prior violent act, I believe the jury would be much more inclined to find that the appellant is a violent individual who should be removed from society for as long as possible. Thus, after hearing the prior bad act evidence the jury was much more likely to find the appellant guilty of aggravated murder rather than consider the evidence that could weigh in favor of a voluntary manslaughter verdict. Certainly, that evidence had some impact on the jury's decision.

{¶70} I also wish to emphasize that, absent the evidence of the prior bad act, I would have no difficulty accepting a jury verdict for aggravated murder. Here, the appellant needlessly took a human life. Such conduct should never be taken lightly or go unpunished. However, I believe that every defendant should receive a fair trial and, because of the prior bad act evidence, this particular defendant did not, in my view, receive a fair trial.

{¶71} Thus, based upon the foregoing reasons I would reverse the trial court's judgment of conviction and sentence and remand this matter for a new trial that does not include evidence of the defendant's thirteen year old prior bad act.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J.:      Concurs in Judgment and Opinion.
Abele, J.:     Dissents with Opinion.

For the Court,

BY:    _____
              Matthew W. McFarland, Judge

### NOTICE TO COUNSEL
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**