[Cite as *In re R.C.*, 2020-Ohio-1486.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No. 19CA20 |
| R.C. | : | |
| Alleged Delinquent Child | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| | | **RELEASED 4/10/2020** |

<u>APPEARANCES</u>:

Sara Barger, Barger Law Office, LLC and Dennis Kirk, Kirk Law Office, LLC, Hillsboro, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, and James Roeder, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.

Hess, J.

{¶1} R.C. appeals the trial court's decision adjudicating him a delinquent child as a result of committing gross sexual imposition in violation of O.R.C. 2907.05(A)(4). R.C. contends that the trial court erred by denying his motion to suppress his statements made to an investigating detective. He argues that he was not properly advised of his *Miranda* rights and he lacked the capacity to knowingly and intelligently waive those rights. R.C. also contends that his adjudication of delinquency was against the manifest weight of the evidence because the record does not support a finding that the incident occurred or that he acted with the purpose of sexual arousal or gratification.

{¶2} We conclude that the trial court did not err in denying R.C.'s motion to suppress because R.C. was not in custody at the time of the interview, thus his *Miranda* rights were not triggered, and his statements were made knowingly, intelligently, and voluntarily. Additionally, we find that the trial court's judgment is not against the manifest weight of the evidence. We find that the trier of fact did not lose its way and create such

a manifest miscarriage of justice that the conviction must be reversed. We overrule R.C.'s assignments of error and affirm the trial court's judgment.

## I. PROCEDURAL HISTORY

**{¶3}**  In February 2019, the state filed a complaint alleging that R.C. was a delinquent child because he had sexual contact with M.G., a child less than thirteen years of age, in violation of O.R.C. 2907.05(A)(4), gross sexual imposition. Prior to the adjudicatory hearing, R.C. filed a motion to suppress the statements he made to an investigating detective on two grounds: (1) he was not properly advised of his *Miranda* rights and (2) his statements were not made knowingly, intelligently and voluntarily.  The trial court denied the motion, finding that R.C. was not in custody when the statements were made and that the circumstances surrounding his statements showed that they were made knowingly, intelligently and voluntarily. Following an adjudicatory hearing, the Juvenile Division of the Highland County Court of Common Pleas found R.C. to be a delinquent child. R.C. appealed.

## II. ASSIGNMENT OF ERROR

**{¶4}**  R.C. assigns the following errors for our review:

1. The trial court erred by overruling appellant's motion to suppress as appellant did not give a voluntary, knowing, and intelligent confession.

2. The trial court erred by finding that appellant was delinquent by reason of gross sexual imposition because such a finding was against the manifest weight of the evidence.

## III. LAW AND ANALYSIS

### A. Motion to Suppress

### 1. Standard of Review

**{¶5}** In general "appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* " 'Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Codeluppi* at ¶ 7, quoting *Burnside* at ¶ 8.

### 2. General Principles Concerning Custodial Interrogations

**{¶6}** The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that no person shall be compelled to be a witness against himself or herself in any criminal case. *State v. Arnold*, 147 Ohio St.3d 138, 2016–Ohio–1595, ¶ 30. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*, 110 Ohio St.3d 270, 2006–Ohio–4477, ¶ 6, quoting *Miranda* at 479.

{¶7}    Police are not required to administer *Miranda* warnings to every person they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). *Miranda* warnings are required only for custodial interrogations. *Id.* *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444, 86 S.Ct. 1602.

{¶8}    "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner,* 102 Ohio St.3d 358, 2004–Ohio–3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). After the circumstances surrounding the interrogation are reconstructed, "the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a ' " 'formal arrest or restraint on freedom of movement' " ' of the degree associated with a formal arrest." *Id.,* quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L .Ed.2d 1275 (1983), quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Whether an individual is in custody is an objective inquiry. *J.D.B. v. North Carolina,* 564 U.S. 261, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011); *State v. Hambrick*, 4th Dist. Ross No. 15CA3497, 2016-Ohio-3395, ¶ 15; *In re C.M.R.*, 2nd Dist. No. 27519, 2018-Ohio-110, 107 N.E.3d 34, ¶15-16.

**{¶9}** The United States Supreme Court has recognized that, "[i]n some circumstances, a child's age 'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.' " *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 271–272, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011), quoting *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The Court held that, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *Id.* at 277, 131 S.Ct. 2394.

**{¶10}** In his motion to suppress, R.C. identified few factors to support his contention that the interview was custodial in nature. He stated that it took place in a patrol vehicle parked at R.C.'s residence and started with the investigator, Detective Engle, stating that she "has to give Miranda" even though she told R.C. that "he is not under arrest, which seems to contradict the Miranda she believes she is required to provide." (OR. 20, p. 2) The trial court found that the interview was not custodial in nature and did not trigger *Miranda* rights.

**{¶11}** At the suppression hearing Detective Engle testified that she interviewed R.C., a 17-year-old tenth grade student, (Tr. 7) at his home in her vehicle with his mother present. Detective Engle's vehicle was an unmarked police car equipped with a two-way radio, and Engle was wearing a detective uniform. (Tr. 30-31) Detective Engle audio-recorded the interview, which was played for the court. (May 31, 2019 Hearing Tr. p. 6) Detective Engle began the interview by telling R.C. that he was not under arrest and would not be leaving with her. She told R.C., "you can choose to end this interview at any

point in time and get out of my car and go back into the house." (Tr. p. 7) After approximately thirty minutes, Detective Engle finished her interview with R.C., turned the recording off, and R.C. exited her vehicle and went back into his house. (Tr. 24) Detective Engle and R.C.'s mother, who was seated in the back seat of the vehicle, continued to talk for approximately twenty more minutes after R.C. left. (Tr. 24) Detective Engle testified that she never asked R.C. if he understood the idea that he could leave at any time, but she had explained to him and also to his mother that they did not have to participate in the interview and that R.C. was free to get out of the vehicle at any time he chose. (Tr. 28)

**{¶12}** R.C.'s mother testified that when Detective Engle arrived at R.C.'s house, she spoke to Detective Engle prior to her interview with R.C. and told Detective Engle that R.C. has short-term memory problems, gets confused, and has an IEP.[1] R.C.'s mother testified that Detective Engle told her to "stay quiet unless I had a major question or something" as "the interview was between the two of them." (Tr. 42) R.C.'s mother testified that R.C was in tenth grade, has never had any experience with law enforcement, and has never been interviewed by law enforcement prior to his interview with Detective Engle.  (Tr. 46, 48)

**{¶13}** R.C. testified that he felt pressure to answer Detective Engle's questions but that he "sort of" understood that he was free to leave and get out of the car and "sort of" knew that he could stop that interview at any point. (Tr. 52, 53, 54) R.C. testified that he was sitting in the front seat of the unlocked vehicle. (Tr. 56) R.C. agreed that his feelings of pressure could also have been nervousness at being question by a police

---

[1] Individualized Education Program, *see* O.A.C. 3301-51-07. The record contains no additional evidence of R.C.'s cognitive abilities, memory function, or learning disabilities.

officer. (Tr. 56) R.C. testified that he did not see any guns or handcuffs and was told that he could leave anytime. (Tr. 56)

{¶14}  After a careful review of the record, we find that R.C. was not in custody for *Miranda* purposes at the time he spoke with Detective Engle. Detective Engle spoke to R.C.'s mother and the mother agreed to bring R.C. to the patrol car to be interviewed and was present throughout it. At the beginning of the interview, Detective Engle explained that R.C. was not under arrest and could choose to end the interview, get out of the patrol car, and go back inside his home. R.C. sat, without handcuffs, in the front of an unlocked patrol car in front of his house and was questioned for approximately 30 minutes. R.C. was not under arrest and was not "otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. At the time of the interview R.C. was 17 years old and a tenth-grade student. That the interview occurred in a police vehicle is not alone sufficient to establish it was custodial. *In re M.D.*, 12th Dist. Madison No. CA2003-12-038, 2004-Ohio-5904, ¶ 18.

{¶15}  Because R.C. was not in custody at the time he spoke with Detective Engle, the trial court properly denied his motion to suppress on the ground that the interview was not a custodial interrogation and thus R.C.'s *Miranda* rights were not triggered. Because R.C. was not in custody, law enforcement had no obligation to inform him of his *Miranda* rights and R.C.'s arguments that he did not knowingly waive them or that law enforcement did not properly recite them are moot.[2]

### 3. General Principles Concerning Confessions

---

[2] The record shows that Detective Engle informed R.C. that anything he said could and would be used against him, that he had a right to an attorney, and if he could not afford an attorney one would be appointed for him, but she did not inform R.C. that he had the right to remain silent. (May 31, 2019 Tr. p. 6-7)

**{¶16}** A second argument R.C. raised in his motion to suppress was that, "even if Miranda was not required * * * [R.C.'s] alleged confession was not knowingly, voluntarily, or intelligently given." (O.R. 20, p. 5) In his appellate brief, R.C. contends that he "did not voluntarily, knowingly, and intelligently waive his Miranda Rights and confess to a crime." (Brief p. 9) However, much of his argument addresses his waiver of *Miranda* rights, which we have determined is moot as his interview was noncustodial. It is unclear from his argument which facts from the record R.C. believes supports his contention that – aside from compliance with *Miranda* – his confession was involuntary. However, in the interest of justice we will take those same factors as grounds supporting his contention that his confession was involuntary.

**{¶17}** Separate from the issue of compliance with *Miranda* in custodial interrogations is the voluntariness of the defendant's confession. *In re N.J.M.,* 12th Dist. Warren No. CA2010–03–026, 2010-Ohio-5526, ¶ 18, citing *State v. Chase,* 55 Ohio St.2d 237, 246, 378 N.E.2d 1064 (1978). "Even where *Miranda* warnings are not required, 'a confession may [still] be involuntary [and excludable] if on the totality of the circumstances, the defendant's will was overcome by the circumstances surrounding the giving of the confession.' " (Brackets sic.). *In re N.J.M.* at ¶ 18, quoting *State v. Fille,* 12th Dist. Clermont No. CA2001–08–066, 2002-Ohio-3879, ¶15 and *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**{¶18}** To satisfy due process with respect to a challenged confession, the state must prove by a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The due process test for voluntariness takes into consideration the totality of the circumstances. *Dickerson*

*v. U.S.*, 530 U.S. at 433–434, 120 S.Ct. 2326, 147 L.Ed.2d 405, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

{¶19} The Supreme Court of Ohio addressed confessions in the juvenile context in *Barker, infra*:

> The totality-of-the-circumstances test takes on even greater importance when applied to a juvenile. * * * The totality-of-the-circumstances test allows courts necessary flexibility to consider a juvenile's age and experience.  The court stated as follows:
>
>> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation, [including] evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
>>
>> * * * " 'It is now commonly recognized that courts should take "special care" in scrutinizing a purported confession or waiver by a child.' "  When an admission is obtained from a juvenile without counsel, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Citations omitted, brackets sic.)

*State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 38-41.

{¶20} R.C. contends that he did not voluntarily confess to a crime because he had "memory troubles," "would need additional time to answer the detective's questions," was "rapidly asked numerous questions," "had no previous interaction with law enforcement," "was asked closed ended questions," "was provided the crime details," and underwent "extensive and intense questioning by the detective" to which he "eventually acquiesced." R.C. also contends that he was "a juvenile with a low functioning mental capacity" that was "highly impressionable and susceptible to coercion."

**{¶21}**  After carefully reviewing the record, including R.C.'s recorded interview, we find, based on the totality of the circumstances, that R.C.'s statements to Detective Engle were voluntary.

**{¶22}**  The record shows that before the questioning began, R.C. was told he could end the interview, leave and go back into his home. His mother was sitting with him during the entire interview, during which time Detective Engle questions him for only approximately 30 minutes. R.C.'s interview with the detective was not particularly lengthy, intense or frequent. *In re N.J.M.*, 2010–Ohio–5526 at ¶ 25.

**{¶23}**  Although as the trial court noted, the detective's questioning technique was arguably "not standard or appropriate," (Tr. 59) she did not use coercive police tactics to obtain R.C.'s statements. "Coercive police activity is a necessary predicate to the finding that a suspect involuntarily confessed."  *In re R.L.*, 2014-Ohio-5065, 23 N.E.3d 298, ¶ 22 (2nd Dist.), citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Coercive law enforcement tactics include, but are not limited to, physical abuse, threats, deprivation of food, medical treatment or sleep, use of certain psychological techniques, exertion of improper influences or direct or implied promises, and deceit. *In re N.J.M.*, 2010–Ohio–5526 at ¶ 20. There is no evidence of physical deprivation, mistreatment, threats, or improper inducement. Although the detective repeatedly told R.C. she did not believe that he could not remember the events and questioned his credibility, admonitions to tell the truth are both permissible and non-coercive. *Id.* at ¶ 25; *State v. Lewis*, 7th Dist. Mahoning No. 03 MA 36, 2005–Ohio–2699, ¶ 15.

**{¶24}** Detective Engle told R.C. the victim's version of events and asked him whether the events occurred as she described. R.C.'s responded repeatedly that he did not know or could not remember. Detective Engle's interview consisted entirely of long narrative statements and leading questions about the events and whether R.C. touched the victim's buttocks and breasts, to which R.C. eventually responded, "I think so." However, "the use of leading questions does not coerce an individual to submit to those questions." *Lewis* at ¶ 16. During the interview, R.C. repeatedly stated that he did not recall the incident. However, R.C. also stated that he "sort of" remembered laying on the top bunk with the victim while they both watched R.C.'s brother play a video game and he thought he may have touched the victim's buttocks. After the detective explained the victim's version of events, R.C.'s responses were either to state that he did not remember, or that he thought her story might be correct.

**{¶25}** The record shows that R.C. was a tenth grader with no prior criminal history at the time of the interview. Although his mother stated that R.C. had memory issues and had an IEP, there was nothing in the record, including the recorded statement, to support counsel's contention that  R.C. was "a juvenile with a low functioning mental capacity" that was "highly impressionable and susceptible to coercion."  R.C.'s age and mentality did not prevent him from understanding the questions and answering them. Moreover, diminished cognitive abilities do not necessarily equate to an involuntary statement, especially where the juvenile does not have difficulty understanding questions, and the juvenile's responses were clear and responsive. *In re M.J.C.,* 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 16-21 (the confession of a 15 years old who had trouble reading at a third grade level; was diagnosed with a mood disorder, ADHD, and a

psychotic disorder; only prior criminal experience was a runaway charge; and where the investigating detective repeatedly questioned juvenile's credibility and asked several leading questions, was voluntary); *In re R.L.*, 2014-Ohio-5065, 23 N.E.3d 298, ¶ 20-28 (2nd Dist.) (nine-year-old juvenile's statements to police officer during noncustodial conversation were voluntarily made.); *In re N.J.M.*, 2010–Ohio–5526 at ¶ 27 (the confession of a 13–year–old boy with no prior criminal experience, an IQ of 67, and delayed cognitive and emotional development, was voluntary).

**{¶26}** R.C. was never confused and never sounded as though he was in acute distress. R.C.'s mother was present in the back seat and R.C. was not prevented from conferring with her or vice versa. No "police trickery" or deceit was alleged or shown. Nothing in the record suggests that R.C.'s will was overborne. In light of the foregoing, we find that R.C.'s statements to Detective Engle were voluntary.

**{¶27}** The trial court properly denied R.C.'s motion to suppress. We overrule his first assignment of error.

### B. Manifest Weight of the Evidence

**{¶28}** For his second assignment of error, R.C. contends that the trial court's finding of delinquency for gross sexual imposition is against the manifest weight of the evidence because the record does not support a finding that an incident occurred beyond a reasonable doubt. And, the record does not support the finding that R.C. acted with the purpose of sexual arousal or gratification.

### 1. Standard of Review

**{¶29}** "[I]n the juvenile context we employ the same standard of review applicable to criminal convictions claimed to be against the manifest weight of the evidence." *In re*

*Higginbotham*, 4th Dist. Lawrence No. 04CA26, 2004-Ohio-6004, ¶ 4, citing *In re Watson,* 47 Ohio St.3d 86, 91, 548 N.E.2d 210 (1989). In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119; *State v. Woods*, 2018-Ohio-4588, 122 N.E.3d 586, ¶ 64 (4th Dist.).

**{¶30}** "[U]nder *Thompkins,* even though there may be sufficient evidence to support a conviction, a reviewing court can still reweigh the evidence and reverse a lower court's holdings. Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 citing *Thompkins* at 386-87, 678 N.E.2d 541. "In other words, a reviewing court asks whose evidence is more persuasive— the state's or the defendant's?" *Id.* Although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* "[T]he civil-manifest-weight-of-the-evidence standard affords the lower court more deference then does the criminal standard." (Citations omitted.) *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 26. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party

having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Citations omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶31}  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." (Citations omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. " 'However, this review is tempered by the principle that questions of weight and credibility are primarily for the trier of fact.' " *State v. Elkins*, 4th Dist. Lawrence No. 17CA14, 2019-Ohio-2427, ¶57 quoting *State v. Garrow*, 103 Ohio App.3d 368, 371, 659 N.E.2d 814 (4th Dist.1995).

{¶32}  "If the prosecution presented substantial evidence upon which the trier of fact could reasonably conclude, *beyond a reasonable doubt*, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence." (Emphasis added.) *State v. Elkins*, 4th Dist. Lawrence No. 17CA14, 2019-Ohio-2427, ¶¶ 57-58 citing *State v. Picklesimer*, 4th Dist. Pickaway No. 14CA17, 2015-Ohio-1965, ¶ 8. "Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." *State v. Dyer*, 4th Dist. Scioto No. 07CA3163, 2008-Ohio-2711, ¶ 12; R.C. 2901.05 "A reviewing court should find a conviction against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily

against the conviction." (Internal quotations omitted.) *State v. Taylor*, 4th Dist. Ross No. 13CA3419, 2016-Ohio-1231, 62 N.E.3d 591 ¶ 31, quoting *State v. Thompkins*, 78 Ohio St.3d at 387.

### 2. Legal Analysis

**{¶33}** R.C. was adjudicated delinquent for committing gross sexual imposition in violation of O.R.C. 2907.05(A)(4), which provides in relevant part:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when:
\*       \*       \*
(4) The other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person.

**{¶34}** O.R.C. 2907.01(B) defines  "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶35}** The trial court held an adjudication hearing over two days in July and August 2019. At the hearing the victim, M.G., testified that when she was 10 years old in November 2018 she was in R.C.'s bedroom with him and two other friends, G.L. and K.B.. (July 19, 2019, Tr. 8-9) Her friends G.L. and K.B. were playing a video game together and she and R.C. were on the top bunk. (Tr. 11-12) M.G. testified that while they were laying on the top bunk, R.C. got close to her and put his hand down her pants. She told him to back away and he tried to do it again. After that, M.G. told the group that it was time for her to go home and, because she was feeling uncomfortable, she left and went home. (Tr. 13) M.G. testified that the next day she told her friend K.B. about it and, about a month

later, told her mother. (Tr. 15) M.G. testified that her mother called the police and eventually M.G. talked to Detective Engle about the incident.

{¶36} M.G. testified that during her interview with Detective Engle, M.G. was presented a drawing with a girl's body and M.G. marked the location on the drawing where R.C. touched her. The drawing indicated that M.G. was touched on her buttocks and breast. (Tr. 17, Ex 2) M.G. explained that R.C. touched her breast earlier that day when she was looking around his house and his room, "[H]e came up behind me and he grabbed underneath my chest, which made me feel real uncomfortable. But I thought he was just rouse [sic] house…like rough house playing or whatever so I just ignored it. So, I don't know if that's what he was doing but it just made me feel really uncomfortable." (Tr. 18)

{¶37} On cross-examination, M.G. testified that she did not tell her mother about the incident until after a month or two after it happened and that she initially told law enforcement that the incident occurred in the garage, not R.C.'s bedroom. (Tr. 20, 21) M.G. also testified that both she and K.B. were neighbors of R.C.; that K.B. was spending more time at R.C.'s house; that this made M.G. mad because K.B. was her best friend; and that this was all happening before M.G. reported that R.C. had touched her. (Tr. 24-25) On re-direct, M.G. explained that her statement that the incident occurred in the garage was a lie, "I feel like I was just like wanting to tell it and I feel like I was kind of confused but it was in his room, I kind of think I lied but it was in his room." (T. 26)

{¶38} K.B. testified that she was in the bedroom the entire time and did not see R.C. touch M.G. However, K.B. testified that during some of the relevant time period, she was on the bottom bunk and M.G. was on the top bunk. M.G. eventually got down off the

top bunk and joined K.B. on the bottom bunk. (Tr. 33-35) K.B. testified that M.G. and R.C were never up on the top bunk together. (Tr. 41) K.B. testified that R.C., R.C.'s friend G.L. and R.C.'s brother V.C. were all three playing video games, there were three to five video game systems in the room, and she and M.G. were watching them. (Tr. 32) K.B. also testified that she did not learn of the touching incident until Detective Engle came to school two to three months later and pulled her out of recess to talk to her. (Tr. 37)

{¶39} G.L. testified that he was R.C.'s 14-year-old friend and was in the room the entire time except to use the restroom or get a drink of water. (Tr. 49-50) G.L. testified that he never saw R.C. on the top bunk with M.G. or have any physical contact with M.G. (Tr. 51-52) G.L. testified that there were three video game consoles in the room and he, R.C., and R.C.'s brother V.C. were at the three gaming consoles (Tr. 49-51) G.L. testified that it was common for R.C. and him to sit playing video games for hours without getting up. (Tr. 59)

{¶40} V.C. was R.C.'s 20-year old brother. V.C testified that he was in the bedroom while M.G. was present. V.C. testified that R.C., G.L. and he all were playing video games during her visit. (Tr. 61) V.C. never saw R.C. on the top bunk with M.G. or touch her.

{¶41} L.C. was R.C.'s father and testified that he has poor vision and is blind in one eye. (Tr. 66) He testified that he checked in on the group during M.G.'s visit. R.C., V.C. and G.L. were all three on their consoles playing video games and K.B. and M.G. were watching. L.C. saw M.G. on the top bunk and told M.G. to get off the top bunk, but M.G. was reluctant to do so because she told L.C. she could see the computers better from up there. L.C. testified that he had to make M.G. get down off the top bunk.(Tr. 68-

69) L.C. did not see R.C. up on the top bunk with M.G.  L.C testified that M.G. eventually left and went home but she did not seem upset and returned later that evening to play outside in the front yard with R.C. and the others. (Tr. 71) L.C. did not become aware of the accusations against R.C. until a sheriff appeared at his house. (Tr. 71)

**{¶42}** Detective Engle testified that she investigated the case and interviewed R.C. in the driveway of his home approximately two months after the alleged incident. (August 22, 2019, Tr. 7) Detective Engle testified that R.C. admitted that on the date of the incident, he was in his bedroom with his friends, he and M.G. were on the top bunk, and that he touched M.G.'s "butt." (Tr. 9-10) Detective Engle testified that R.C. at first could not recall the incident, "at first he appeared to have no knowledge of what I could be talking about, but the longer that we talked he was very aware of what we were talking about." (Tr. 12)

**{¶43}** On cross-examination, Detective Engle admitted that she provided R.C. with nearly all of the details of the crime, asked leading and closed-ended questions (i.e. "did you slide over to her or did you reach your arm over?" (Tr. 39)), and that R.C.'s overwhelming responses were "I don't know," "sort of," I don't remember," and "I don't know."  (Tr. 45-48) Detective Engle testified that she only interviewed the victim and R.C. She did not interview any of the other children or parents present at the time. (Tr. 13-14) Detective Engle denied that her mind was made up before she interviewed R.C. or that the tone of her interview with R.C. would lead a listener to believe that her mind was made up about the incident prior to interviewing R.C. (Tr. 17) Nevertheless, in the recording of the interview,[3] Detective Engle begins by telling R.C., "I would like to talk to you about a

---

[3] The entire recorded interview was played into the record and a CD of the interview was part of the appellate record. (Tr. 29, State Ex. 1)

particular incident. Now when I ask you this, I don't want you to seem that um that I think you are a monster or that I think you prey on young girls or anything like that. Um, and I can see how young girls now a days aren't like young girls when your mom and I were young." (Tr. 30)

{¶44} Detective Engle then asks, "There was an incident where your brother and you were in your room and your brother was playing X-Box with [K.B.] and there was another child in the room. Do you remember who that child would have been? Do you remember [M.G.] coming over to your house?" When R.C. answers, "She has before but I don't exactly remember?" Engle adds, "Roughly about a month ago?" R.C. responds, "I don't remember." (Tr. 30-31) After R.C. fails to recall the specific time a month earlier that he was playing video games in his room with friends, Detective Engle responds, "Okay, I want you to understand something, I know you have trouble with memory but we are kind of trained to say hey, we don't want to recall a memory or when a bad memory comes into effect blood goes to your brain, extra blood flow and your vein sticks out on your neck because you've recalled something that you don't wish to remember." Still, R.C. responds that he does not recall the incident.(Tr. 31)

{¶45} Detective Engle describes the incident in detail for R.C. and then asks if he remembers it and R.C. responds several times that he does not recall it.  Detective Engle provides more details, asking multiple questions without waiting for an answer and then concludes by asking, "And she went home because she was scared?" R.C. responds to the monologue and compound questioning with, "Sort of." (Tr. 32) R.C. agrees that he sort of remembers touching M.G.'s "butt" and then when asked for details, R.C. gives Detective Engle the details she had provided to him earlier in the interview: he and M.G.

were on the top bunk watching V.C and K.B. play X-Box. R.C. is unable to provide any details of the incident not already provided to him by Detective Engle.

**{¶46}** When prodded for details he can remember about the day, R.C. repeated stated that he cannot remember, "I don't even remember what we did even yesterday sometimes." (Tr. 32) R.C. states that he may have laid on the top bunk with M.G. watching his brother V.C "playing X-Box on his TV," but that he does not remember much else about it. (Tr. 33) Later when Detective Engle asks, "Were you and [M.G.] talking or were you just watching the PlayStation?" R.C. changes his original answer that they were watching V.C. play "X-Box" and adopts Detective Engle's version that he and M.G. were watching "PlayStation." (Tr. 36-37)

**{¶47}** When Detective Engle asked R.C. a leading exculpatory question, "* * * I know your mom told me you have memory issues and I'm okay with that but again we are trained to interview people and anytime you don't want to recall something negative, everything about you changes. * * * And I'm almost certain that you're not the monster out there that you see on TV that touches young girls, is that correct? You don't go around touching neighborhood girls, do ya?" R.C. responds, "No, I don't." (Tr. 35) After a period of silence and indecipherable mumbling on the recording during which it sounds like R.C. is reluctant to talk further with Detective Engle, she asks, "I don't want to sit here and feel like you are a monster, [R.C.]. But we do have a story out here that has to be told and most times, 9 times out of 10 you don't want just one side being told. Which is why I am here today instead of throwing you in handcuffs and arresting you. Again, I come with no handcuffs, I come to talk. I don't have you in my backseat, behind the cage. * * * So, at

this point [R.C.] I need your side of the story. So, that I don't have to present one side." R.C. responds, "If I don't remember that, how can I actual [sic] say it." (Tr. 36)

**{¶48}** Detective Engle describes the second incident in which R.C. allegedly touched M.G.'s breasts, "Okay, do you remember um when [M.G.] got ready to leave and she was standing at the bottom, on the bottom bunk, talking to [K.B.], standing beside [K.B.], you came up behind her and with your palms facing her breasts, you might have gave her a hug and touched her breasts?" R.C. responds, "I don't know." Detective Engle then responds, "You see [R.C.] when I ask you direct questions, you tend to shut down like you do recall, you just don't want to say." R.C. responds, "It's because I am trying to think."(Tr. 38-39) Eventually after repeatedly being asked about touching M.G.'s breast, R.C. responds, "I think so but it was messing around, (inaudible) grab her from behind, like holding, just messing around." (Tr. 41)

**{¶49}** After repeatedly stating that he cannot recall much about the day or does not remember, Detective Engle asks, "Do you remember that day, [R.C.]?" R.C., "Not exactly." Detective Engle, "Do you remember bits and pieces of that day? So, when, so did you touch her butt?" R.C., "I think so." (Tr. 39) Then Detective Engle asks a series of close-ended questions and R.C. chooses one of the two choices. Detective Engle, "Okay, how did that come about? She's on the top bunk, you're on the top bunk. Everybody's watching X-Box, did you slide over close to her or did you reach your arm over?" R.C, "I think I reached my arm over." Detective Engle, "Okay, and when you reached your arm over, did you touch her on the outside of her jeans or did you try to slide your hand down her pants?" R.C., "I think I tried to slide my hand down her pants." (Tr. 39) In response to a series of leading questions, R.C. admitted that he thinks he may have touched M.G.'s

skin when he put his hand in her pants, but doesn't exactly remember. He agreed that he may have put his hand her M.G.'s pants a second time but only touched M.G.'s underwear. R.C. admitted that afterward, he thinks M.G. got down off the top bunk and he may have stayed on the top bunk. (Tr. 41)

{¶50} Detective Engle admitted that she had been given information prior to the interview that R.C. had difficulties with memory and was very suggestable and agreeable, (Tr. 20) yet she agreed that she "did go at him repeatedly," provided him with most of the crime details, and gave him limited options for answers. She agreed that R.C. gave noncommittal or vague responses throughout much of her interview. (Tr. 45-48)

{¶51} The trial court found R.C. a delinquent child. In its decision, the trial court focused primarily on the testimony of the victim, M.G., and R.C.'s recorded statements. The court noted that the state established that M.G. was a 10-year-old child. M.G. testified that R.C. put his hand down her pants on several occasions and that earlier in the day R.C. had reached around her and touched her breasts. (Tr. 57) As for R.C.'s recorded interview, the trial court found that R.C. "did say I think I touched her butt and I reached my arm around over and tried to slide my hand down her pants, [M.G.] just laid there." (Tr. 58) The trial court found it significant that while R.C. "never admitted" the alleged incident, he also "certainly never denied."  (Tr. 59) The trial court criticized the interview technique used with R.C. as arguably "not standard or appropriate" but determined that, in this particular case, the inappropriate interview technique did not "mean that [R.C.] gave a false conf… [sic] confession." (tr. 59-60) Ultimately the court found, "I do believe the touch happened. M.G. detailed what happened and R.C. never denied it, ever. In fact,

said I think so, I think so. So, I do believe it happened beyond a reasonable doubt." (Tr. 60)

{¶52} As for the element of "sexual contact," the trial court discounted the incident involving the breast touching, finding that the circumstance as described by both M.G. and R.C. was likely just horsing around. However, as to the touch to the buttocks, the trial court found that the touch occurred and that it was done for the purpose of sexual arousal or gratification because R.C. was 17 years old and M.G. was 10 years old and R.C. placed his hands into her pants and touched her skin. (Tr. 61)

{¶53} On a manifest weight of the evidence challenge, an appellate court will not reverse a conviction on that basis unless it is obvious that the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. After a close examination of the state's evidence we cannot find that the trier of fact lost its way and that a manifest miscarriage of justice has occurred.

{¶54} Although there was inconsistent testimony concerning the breast touching/hugging, the trial court ultimately determined it was "just horsing around" and did not constitute gross sexual imposition. (Tr. 61) We find that the manifest weight of the evidence supports the trial court's rejection of the breast touching as a ground for the gross sexual imposition charge. Both the victim and R.C. testified that they believed it was just horse play and their respective testimony about it was inconsistent as to time and place. Detective Engle led R.C. to agree that after M.G. got down off the bottom bunk and was standing next to K.B., he came up behind her, hugged her and touched her breast. (TR. 38, 41) However, M.G. testified that the hugging/breast touching incident occurred earlier in the day and not while she was next to K.B. getting ready to leave.

Thus, the version of events that Detective Engle got R.C. to agree to were not the same version that M.G. testified to at trial. Likewise, none of the other witnesses who were in the bedroom saw R.C. hug M.G. inappropriately when M.G. stated she was going home.

**{¶55}** The trial court found that M.G.'s testimony and R.C.'s recorded statement were the most important and relevant testimony concerning the buttocks-touching incident. We agree. The other witnesses were not in a position to have noticed whether R.C. slipped his hand down the back of M.G.'s pants while both were lying on the top bunk. M.G. did not make a loud protest, but rather moved away, got down, and went home.

**{¶56}** As for R.C.'s recorded statement, although we find that Detective Engle's interview with R.C. did not rise to the level of "police coercion," we afford it minimal weight.[4] Not only did Detective Engle get R.C. to agree to a different hugging incident than M.G. testified had occurred, R.C. also agreed with her when she asked him if they were watching "X-Box" and then agreed with her when she changed it to "Playstation." R.C. also denied touching neighborhood girls when Detective Engle asked the leading question, "You don't go around touching neighborhood girls, do ya?" (tr. 35) but then acquiesced to possibly touching M.G. when asked leading questions about it.  R.C. repeatedly stated throughout the interview that he had memory issues and simply could not recall the incident. Detective Engle acknowledged she had been told that R.C. was very suggestable and agreeable, (Tr. 20) yet she provided him all the pertinent details of the crime and led him through the interview with narrative, leading and closed-ended

---

[4] At the suppression hearing, Detective Engle admitted that R.C.'s interview was her first interview, that it was the first time she ever issued a *Miranda* warning, that it was her "first solo case" and that she had no interview training prior to the case, but has had some training since. (May 31, 2019 Hearing Tr. p. 25)

questions. R.C. provided no independent facts about the incident that were not already provided to him by Detective Engle. While we acknowledge we typically defer to the trial court on matters of credibility, we do this less so in criminal matters, and here, where R.C.'s interview was an audio recording, the trial court has no greater advantage in assessing its credibility and weight than we do.

**{¶57}** However, the trial court found the victim's testimony about the buttocks-touching incident to be credible. The victim was present and testified in court where the trial court had an advantage over us in assessing her credibility and the weight to afford her testimony. The weight and credibility of evidence are to be determined by the trier of fact. *State v. West,* 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." *Id.* We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id.; see also State v. Minton,* 2016-Ohio-5427, 69 N.E.3d 1108, ¶ 79-80 (4th Dist.).

**{¶58}** Here, the trial court was able to observe the victim on the witness stand, and was in the best position to judge and weigh her credibility. The victim's testimony about her previous lie to law enforcement was also observed by the trial court, as was her testimony concerning her jealousy motive to fabricate the event. The trial court was free to believe all, part, or none of her testimony. In sum, the trial court had before it sufficient facts to ascertain the victim's credibility and to weigh it accordingly, and we will not substitute our judgment for that of the trier of fact.

**{¶59}** Additionally, the evidence supports the trial court's finding that the buttocks touch occurred for the purpose of sexual gratification. We explained the proof of sexual gratification as follows:

> Proof of sexual gratification generally must be accomplished by inference rather than by direct evidence. See *State v. Cobb* (1991), 81 Ohio App.3d 179, 185, 610 N.E.2d 1009, 1012. In *Cobb,* the court noted that: "[T]he proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01. In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts the trier of fact may infer what the defendant's motivation was in making the physical contact with the victim. If the trier of fact determines, that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Id. See, also*, *In re Anderson* (1996), 116 Ohio App.3d 441, 688 N.E.2d 545; *In re Salyers* (June 10, 1998), Ross App. Nos. 97CA2312 and 2319; *In re Bloxson* (Feb. 6, 1998), Geauga App. No. 97–G–2062 (stating that "[a] sexual purpose can be inferred from the nature of the act itself if a reasonable person would find that act sexually stimulating to either the offender or the victim").

(Brackets sic.) *In re Higginbotham*, 4th Dist. Lawrence No. 04CA26, 2004-Ohio-6004, ¶ 18.

**{¶60}** Here, the trial court noted the ages of the victim and R.C. and the circumstances surrounding the touch and found that it was done for the purpose of sexual arousal or gratification. Although there is no direct evidence of R.C.'s sexual motivation, sufficient evidence exists from which the trial court reasonably could have inferred that he committed the act for purposes of sexual arousal or gratification. A reasonable person could conclude that R.C.'s placement of his hand inside M.G.'s pants and on her buttocks constituted contact for purposes of sexual gratification or arousal as there is no innocent explanation for this behavior.

{¶61}  Having reviewed the testimony and the other evidence adduced at trial, we do not believe that the trial court clearly lost its way in convicting R.C. of gross sexual imposition for touching the buttocks of M.G. Thus, the adjudication was not against the manifest weight of the evidence. We overrule R.C.'s second assignment of error.

## IV. CONCLUSION

{¶62}  We overrule R.C.'s assignments of error and affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED.  Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the HIGHLAND COUNTY COURT OF COMMON PLEAS, JUVENILE DIVISION to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

For the Court

BY: _____
Michael D. Hess, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**