[Cite as *In re K.C.*, 2025-Ohio-1203.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

IN THE MATTER OF K.C.

        :
        :
        :     C.A. No. 2024-CA-31
        :
        :     Trial Court Case No. 22420269
        :
        :     (Appeal from Common Pleas Court-
        :     Juvenile Division)
        :
        :

. . . . . . . . . . .

O P I N I O N

Rendered on April 4, 2025

. . . . . . . . . . .

JAY M. LOPEZ, Attorney for Appellant

BAILEY J. ARNETT, Attorney for Appellee, Miami County Children Services

. . . . . . . . . . . . .

HANSEMAN, J.

{¶ 1} Appellant, K.C., appeals from an adjudication finding him delinquent and a disposition imposing consequences, including stayed sentences to the Department of Youth Services ("DYS") and mostly-stayed confinement at West Central Detention Center ("WCDC"). According to K.C., the trial court erred in finding that he was a delinquent child based on endangering children under R.C. 2919.22. K.C.'s position is that this statute is

directed toward eliminating abuse and neglect towards children by adults and caretakers, and he does not fit within that category because he was not a babysitter or caretaker for the victim.

{¶ 2} K.C. also claims the trial court erred in finding that he committed extortion under R.C. 2905.11(A)(5). In this regard, K.C. argues that the activity in question, which ended in the victim sending him a nude picture, was an instance of the victim being playful and offering her own sexual advances rather than being distressed or upset.

{¶ 3} For the reasons discussed below, we disagree with K.C.'s arguments and find no error or abuse of discretion on the trial court's part. Therefore, the judgment pf the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 4} In July 2024, the State filed a juvenile court complaint against K.C., age 13, alleging that he was a delinquent child due to acts against E.R. that would constitute extortion under R.C. 2905.11(A)(5) and R.C. 2905.11(A)(1), both third-degree felonies, if committed by an adult. On July 11, 2024, K.C. appeared in court with his custodian and entered a denial of the charges. At that time, the magistrate placed K.C. under "Trust House Arrest," and the case was continued until a July 19 pretrial. K.C. was also ordered not to have contact with the victim, to submit to drug screens, and not to use the internet except for school or court-related purposes and only with adult supervision. Magistrate's Order (July 11, 2024), p. 1-3.

{¶ 5} After K.C. obtained counsel, the matter was set for an attorney conference

at the end of July, and a trial date was then set for August 28, 2024. In the interim, the State filed an amended complaint adding a charge of endangering children in violation of R.C. 2919.22(B)(5), which was a second-degree felony pursuant to R.C. 2919.22(E)(4). On the same day, the State filed a contempt motion, which was labeled as Case No. 22420303. That case is not involved in this appeal, although both parties have agreed that K.C. admitted to the contempt charge and was placed on electronic home detention.

{¶ 6} On August 28, 2024, the judge held a trial on the complaint and heard testimony from the following individuals: the victim, E.R.; Deputy Micah Karn; and Detective Todd Cooper. (Karn and Cooper were both employed by the Miami County Sheriff's Department.) K.C. did not testify, nor did he call any witnesses.

{¶ 7} According to the testimony, Deputy Karn was dispatched on May 11, 2024, to a Troy home on a sex offense call. After Karn arrived, he spoke with E.R. and her parents and was shown a phone and a tablet. After seeing the phone, he decided this was a criminal matter and collected the phone and tablet. Karn then went to K.C.'s home to speak with him about the matter. K.C. told Karn that he knew why Karn was there; he said that it was about text messages from E.R., and that a friend, John, had done it.[1] Karn tried to speak with John that evening, but he was not home. Hearing Transcript ("Tr."), 5-9.

{¶ 8} The phone K.C. used in the text conversation belonged to his grandmother, who gave Karn permission to collect the phone for evidence. Karn then returned to the police station to review the phone messages. He was able to read them and placed the

---

[1] This is not the correct name; we are using a different name to protect the juvenile's identity.

phones in the evidence locker to be downloaded by a detective. *Id.* at 11-12. The following day, Karn spoke with John and his mother and concluded John was not a suspect. After that, Karn returned to K.C.'s home and told K.C. that he knew he had lied and that K.C. had been alone the night of the incident. K.C. then changed his story and said he and John had been "hanging out over the phone" at the time in question. When Karn informed K.C. that he had looked at John's phone and that K.C.'s last contact with John had been six days earlier, K.C. insisted this was not true and that he wanted to stick with his story. *Id.* at 13-14.

{¶ 9} Detective Cooper was trained in mobile, computer, and automotive forensics and used Cellebrite weekly to download information from phones. After downloading the content of phones, his procedure was to move the raw data to a physical analyzer to decrypt the data. Cooper was able to access the phone conversation between K.C. and E.R. and generated a report (State's Ex. 1), which contained 229 text messages. The conversation began on May 11, 2024, at 7:48 p.m. and ended that day at 9:02 p.m. This was the only conversation between K.C. and E.R. on E.R.'s phone. Cooper was not able to download any relevant material from K.C.'s phone. Tr. at 23-24, 26-27, 29, and 32.

{¶ 10} As noted, the victim, E.R., also testified. At the time of the hearing, she was in 8th grade and had known K.C. for about three years. They had been on and off "semi-friends and exes" and had dated during sixth grade and for a few days at the beginning of 7th grade. Tr. at 41-42 and 64. On May 11, E.R. and K.C. had been writing each other on TikTok, and K.C. asked E.R. if they could move to private messages on Apple. When she asked why, he did not give her an answer but kept begging her to do so, and she

finally did. Before privately texting, E.R. asked if K.C. still had the same phone number, and he said yes. E.R. then texted him. *Id.* at 43-44.

{¶ 11} When the text conversation began, E.R. again asked why K.C. wanted to do private messaging, and he failed to answer. He kept saying, "you would say nah," and she said, "you know me, I would say yes." *Id.* at 47. At that point, K.C. said, "you sure." After E.R. responded "what," K.C. said "send." *Id.* E.R. explained that for people their age, "send" means to send a nude photo. *Id.* In response, E.R. said, "what the hell" and "you're gonna spread them around the school otherwise, sure." When K.C. promised that he would not do that, E.R. said, "only if you do it first." *Id.* at 48. E.R. also told K.C. that she could not trust him and reminded him that he still had "moaning" videos of her. *Id.* According to E.R., when she and K.C. dated, K.C. had begged her during a phone call to "moan" for him and threatened to break up with her if she did not. When she agreed, K.C. recorded videos without her knowledge. This took place at the beginning of 7th grade. *Id.* at 48 and 69.

{¶ 12} During the rest of the conversation, K.C threatened repeatedly to send the "moaning" videos to a school group chat unless E.R. sent him a nude picture. The group chat was filled mostly with boys. E.R. attempted to stall and talk K.C. out of it. She even offered to send K.C. a picture of her breast (intending to substitute a picture of a breast she could find on the internet), but that was not satisfactory. The conversation escalated to the point that E.R. threatened to kill herself, but K.C. kept insisting he would send the videos to the school group chat if she did not comply. *Id.* at 49-59. Eventually, telling K.C. that she felt literally forced to do so (and he agreed), E.R. sent him a picture of her vagina.

*Id.* at 48-59. She stated that she felt threatened, disgusted, scared, upset, and manipulated during this process. *Id.* at 52-53, and 56. After K.C. received the photo, he said, "now I'm deleting your number before I get in trouble., see ya." *Id.* at 59.

{¶ 13} Shortly after the conversation ended, E.R. told her mother what had happened and that she had sent a nude photo to K.C. E.R.'s mother then called the police. *Id.* at 62.

{¶ 14} After the State concluded its case, the defense moved for a "directed verdict" [2] on the child endangerment charge, based on the claim that R.C. 2919.22 did not apply because K.C. had not been E.R.'s caretaker or babysitter. *Id.* at 92-93. The court denied the motion, and K.C. rested without calling witnesses.

{¶ 15} After the hearing, the court entered an interim order concluding the State had established beyond a reasonable doubt that K.C. had committed a crime that would be in violation of R.C. 2919.22(B)(5) (endangering a child) if he were an adult and had also committed a crime that would be in violation of R.C. 2905.11(A)(5) (extortion) if he were an adult. Interim Order on Adjudication/Hearing Notice for Further Dispositional Hearing ("Interim Order") (Sept. 4, 2024), p. 2-6. The court did dismiss the second extortion count that was based on the same set of facts, finding it was not in the best

---

[2] This motion was incorrect, as "directed verdicts are not permitted in a bench trial." *In re P.R.P.*, 2018-Ohio-216, ¶ 29, fn. 1 (12th Dist.), citing *Heath v. Heath*, 2017-Ohio-5506, ¶ 34 (12th Dist.). A motion to dismiss could have been made under Juv.R. 29(F)(1). "The Rules of Juvenile Procedure do not have a rule that is analogous to Crim.R. 29(A), which mandates the trial court to enter a judgment of acquittal if the state fails to provide sufficient evidence to support the charged offense. The closest counterpart is Juv.R. 29(F)(1), which permits the juvenile court to dismiss a complaint if the allegations are not proven." *In re Whitlock*, 2008-Ohio-4672, ¶ 8, fn. 2 (11th Dist.), citing *In re Barchet*, 2002-Ohio-5420, ¶ 28 (3d Dist.).

interest of K.C. and the community for him to be found delinquent on two extortion counts in this situation. *Id.* at p. 5. The court made several further orders, including that K.C. remain on electronic monitoring, continue to have no internet access other than for school purposes and with adult supervision, and submit to a sex offender evaluation. *Id.* at p. 6. The court also set a dispositional hearing for October 18, 2024. *Id.*

**{¶ 16}** At disposition, the court imposed a minimum of 12 months to age 21 at DYS on the endangering charge and a minimum of six months to age 21 on the extortion charge, both to be served in a sex offender specific program, with the sentences stayed providing that K.C. complied with various conditions. On each charge, the court further imposed 90-days in the WCDC, with 60 days suspended on each. All sentences were consecutive. The court also remanded K.C. into custody to begin the WCDC sentences, with a release date of December 17, 2024. K.C. timely appealed from the juvenile court's judgment.

## II. Endangering Charge

**{¶ 17}** K.C.'s first assignment of error states that:

> The Trial Court Erred When It Determined That Defendant-Appellant Is a Delinquent Child, Under Count 1, Pursuant to O.R.C. §2919.22(B)(5) and O.R.C. § 2919.33(E)(4).

**{¶ 18}** Under this assignment of error, K.C. contends the trial court erred in finding that he was a delinquent child due to having endangered children. K.C.'s argument is not based on the factual sufficiency or weight of the evidence; instead, K.C. argues R.C.

2919.22 is directed to eliminating abuse and neglect toward children by adults or babysitters and caretakers. Thus, because K.C. was not E.R.'s caretaker or babysitter, the statute does not apply. This is the same argument K.C. made at the adjudicatory hearing when seeking dismissal of the endangering charge. The juvenile court rejected this interpretation, noting that R.C. 2919.22(A) and (B) use different language. Tr. at 94.

{¶ 19} "A 'delinquent' child is one who violates any federal or state law or ordinance of a political subdivision, other than a juvenile traffic offender, if the act would be an offense if committed by an adult." *Steele v. Harris*, 2020-Ohio-5480, ¶ 9, citing R.C. 2151.011(B)(12) and R.C. 2152.02(E)(1). "In Ohio, being found delinquent is different from being found guilty of a crime," and rules in juvenile proceedings differ from those in criminal trials. *In re J.D.S.*, 2014-Ohio-77, ¶ 11 (12th Dist.), citing *In re Good*, 118 Ohio App.3d 371, 375 (12th Dist. 1997).

{¶ 20} As noted, the Juvenile Rules lack a specific rule analogous to Crim.R. 29. However, courts consider Juv.R. 29(F)(1) to be its functional counterpart and therefore apply Crim.R. 29 standards to such motions. *E.g., In re J.S.*, 2010-Ohio-6162, ¶ 14-17 (8th Dist.); *In re Gilbert*, 1987 WL 17709, *2 (12th Dist. Sept. 28, 1987). In this context, "a motion for dismissal in juvenile proceedings should only be granted when, viewing the evidence in a light most favorable to the state, on the evidence before the court reasonable minds could only conclude that the offense charged has not been proven beyond a reasonable doubt." *Gilbert* at *2, citing *In re O'Brien*, 1986 WL 4913, *1 (12th Dist. Apr.21, 1986). (Other citations omitted.) This includes situations in which the State failed to prove the alleged delinquent violated a criminal statute. *In re Elliott*, 87 Ohio

App.3d 816, 819 (12th Dist. 1993). That would include K.C.'s assertion here.

{¶ 21} The offense in question was an alleged violation of R.C. 2919.22(B)(5), which states in pertinent part that:

(B) No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:

. . . .

(5) Entice, coerce, permit, encourage, compel, hire, employ, use, or allow the child to act, model, or in any other way participate in, or be photographed for, the production, presentation, dissemination, or advertisement of any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter.

{¶ 22} Under R.C. 2919.22(D)(4)(b), " 'Nudity-oriented matter' means any material or performance that shows a minor in a state of nudity and that, taken as a whole by the average person applying contemporary community standards, appeals to prurient interest."

{¶ 23} K.C.'s argument about the application of R.C. 2919.22(B)(5) is based on the wording of R.C. 2919.22(A) and the definitions of "child" and "person" in R.C. 2151.011(B). Specifically, R.C. 2919.22(A) states that: "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-

one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." In contrast, R.C. 2919.22(B) refers only to a "person" and does not include any term like parent, guardian, custody or control, etc.

{¶ 24} R.C. 2151.011(B)(6) states, in pertinent part, that a child "means a person who is under eighteen years of age. . . ." Under R.C. 2151.011(B)(33), a "person" is defined as "an individual, association, corporation, or partnership and the state or any of its political subdivisions, departments, or agencies." Because this statute defines "person" and "child" differently, K.C. argues that R.C. 2919.22(B) cannot apply because it refers to a "person," not to a "child." However, one point that K.C. misses is that R.C. 2151.011(B)(6) actually refers to a child as a "person."

{¶ 25} "When interpreting a statute, a court's paramount concern is legislative intent." *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 12, citing *State ex rel. United States Steel Corp. v. Zaleski*, 2003-Ohio-1630, ¶ 12. "To discern legislative intent, we first consider the statutory language, reading the words and phrases in context, according to rules of grammar and common usage." *Armstrong v. John R. Jurgensen Co.*, 2013-Ohio-2237, ¶ 12, citing R.C. 1.42 and *State ex rel. Choices for South-Western City Schools v. Anthony*, 2005-Ohio-5362, ¶ 40. In construing statutes, courts have a duty to "give effect to the words used, not to delete words used or to insert words not used." *Cleveland Elec. Illum. Co. v. City of Cleveland*, 37 Ohio St.3d 50 (1988), paragraph three of the syllabus. "If the meaning of a statute is unambiguous and definite, then it must be applied as written and no further interpretation is appropriate." *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584 (1995), citing *Lake Hosp.*

*Sys., Inc. v. Ohio Ins. Guar. Assn.* 69 Ohio St.3d 521, 524-525 (1994).

**{¶ 26}** We find no ambiguity in R.C. 2919.22, and we attach no import to the fact that the definition section for R.C. Chap. 2151 defines both a "child" and "persons." Because this chapter deals with different parties, it naturally would separately define those individuals to whom the chapter applies. In this vein, the definition section in R.C. 2151.011 also defines an "adult" as "an individual who is eighteen years of age or older." R.C. 2151.011(B)(2). Both adults and children fit within the broad category of "persons."

**{¶ 27}** Generally, criminal statutes apply to the entire spectrum of possible violators. In this regard, R.C. 2901.01(B)(1)(a) states, with exceptions that are irrelevant here, that: "as used in any section contained in Title XXIX of the Revised Code that sets forth a criminal offense, 'person' includes all of the following: (i) An individual, corporation, business trust, estate, trust, partnership, and association." It makes no distinction between types of individuals. As noted, the definition section of R.C. Chap. 2151 also uses the same definition for "person." *See* R.C. 2151.011(B)(33).

**{¶ 28}** Furthermore, as the trial court observed, R.C. 2919.22(A) and (B) do not use the same language. " '[T]he General Assembly, in enacting a statute, is assumed to have been aware of other statutory provisions concerning the subject matter of the enactment even if they are found in separate sections of the Code.' " *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 2014-Ohio-5511, ¶ 26, quoting *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 191-192 (1980). The concept is also well-established that "the General Assembly's use of particular language to modify one part of a statute but not another part demonstrates that the General Assembly knows how to make that modification and has

chosen not to make that modification in the latter part of the statute." *Id.*, citing *Maggiore v. Kovach*, 2004-Ohio-722, ¶ 27, and *In re Election of Member of Rock Hill Local School Dist. Bd. of Edn.*, 76 Ohio St.3d 601, 608 (1996).

{¶ 29} Here, the legislature described a certain category of persons in R.C. 2919.22(A) but chose to include a broader group in R.C. 2919.22(B) ("No person"). Given the specific definition in division (A), the legislature would have known what it could have included in division (B). However, it chose not to do so.

{¶ 30} In 1979, the Supreme Court of Ohio considered whether R.C. 2919.22(A) was unconstitutionally vague based on its reference to " 'substantial risk' " and " 'the duty of care, protection, and support.' " *State v. Sammons*, 58 Ohio St.2d 460, 461-462 (1979). In rejecting the vagueness claim, the court remarked that "a generally acceptable standard of societal attention to the needs and care of our offspring is not difficult of either determination or application. The norm in our society is for a parent to strive to see that his children are reasonably well nourished, housed, and clothed and reasonably protected from harm, and provided with necessary health care." *Id.* at 463.

{¶ 31} The court further commented that "an abundance of statutory law, construed by the courts, . . . defines a parent's duties under the law. *As used in R.C. 2919.22(A)*, the phrase 'duty of care, protection, or support' was intended by the General Assembly to embrace only those duties of a parent toward his child as are imposed by law." (Emphasis added.) *Id.* In this regard, the court also noted that "[t]he Committee Comment to *R.C. 2919.22(A)* implies as much, when it states that: ' . . . Nonsupport as such is cognizable under section 2919.21 of the Revised Code, but if the failure to support

a child results, for example, in the child suffering from malnutrition or exposure, it is an offense under this section.' The Committee Comment makes apparent the intention of the drafters of *this section*. *That intention was to punish a breach of a statutory duty*, when the breach results in a substantial risk to the health or safety of a child." (Emphasis added.) *Id.* Thus, R.C. 2919.22(A) involves statutory duties of adults and other caretakers. Finally, the court rejected the claim about vagueness of the term "substantial risk" by referring to the definition of that term in the criminal code (R.C. 2901.01(H), now R.C. 2901.01(A)(8)). *Id.*

{¶ 32} Again, if the legislature wanted the provisions in R.C. 2919.19(B) to apply only to a "parent, guardian, custodian, person having custody or control, or person in loco parentis of a child," it could easily have said so. However, it did not. This makes sense, because generally, only persons acting in that capacity will have statutory duties towards a child. In contrast, the items listed in R.C. 2919.19(B) do not involve statutory duties. Any person could entice or compel a child "to be photographed for, the production, presentation, dissemination, or advertisement of any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter." R.C. 2919.22(B)(5). This is borne out by the case law.

{¶ 33} On numerous occasions, Ohio courts, including our own, have upheld convictions for violating R.C. 2919.22(B)(5) when the defendant was not a "parent, guardian, custodian, person having custody or control, or person in loco parentis" for or with the victim. *E.g., State v. Simons*, 2000 WL 1726904, *1-2 and 8 (2d Dist. Nov.22, 2000) (defendant took two minor girls to his trailer, gave them some of his wife's lingerie,

watched while they posed sexually, gave suggestions for poses, took one picture, and reloaded the camera with film several times while the girls took many other pictures); *State v. Chisenhall*, 2024-Ohio-1918, ¶ 4 and 37 (12th Dist.) (defendant was charged and convicted of various crimes, including a violation of R.C. 2919.22(B)(5), in connection with his six-month sexual relationship with his daughter's friend); *State v. Badertscher*, 2015-Ohio-927, ¶ 6 (3d Dist.) (defendant pled guilty to several charges, including three counts of endangering children in violation of R.C. 2919.22(B)(5), based on his online communications with minor females during which he encouraged them to send him " 'nudity oriented material.' "); *State v. Jones*, 2024-Ohio-1512, ¶ 2 (6th Dist.) (defendant met runaway minor online, and police found nude photographs of her on his phone). Therefore, we see no reason why K.C. could not have been adjudicated delinquent under R.C. 2919.22(B)(5). As indicated, the statue is not ambiguous, and K.C. has failed to offer any persuasive basis for concluding otherwise.

**{¶ 34}** There is not much law on this point, but in a related context, a juvenile was found to be a delinquent child by reason of having committed the crime of endangering children against a child (by burning the child's penis with a lighter) in violation of R.C. 2919.22(B)(2). The juvenile was also found delinquent due to gross sexual imposition with regard to the child's sisters. There is no indication the juvenile was babysitting or caretaking at the time; the children were playing in bushes in the backyard of their home, and the juvenile apparently simply played with the children at times. *In re Salyers*, 1998 WL 321591, *1-3 (4th Dist. June 10, 1998). The court of appeals affirmed the judgment. *Id.* at *11.

{¶ 35} In the context of gross sexual imposition ("GSI"), the criminal statute contains wording similar to that of R.C. 2919.22(B). Specifically, R.C. 2907.05 states that:

(A) *No person* shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

. . . .

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

(Emphasis added.)

{¶ 36} Our research discloses many instances in which a juvenile has been found delinquent for committing GSI when not in a caretaking or babysitting capacity. For example, a 17-year-old was found delinquent when he improperly touched a 10-year-old neighbor girl while she and friends were visiting and playing video games in his bedroom. *See In re R.C.*, 2020-Ohio-1486, ¶ 35-37 (4th Dist.). The trial court's judgment was affirmed on appeal. *Id.* at ¶ 2. *See also, e.g., In re D.C.*, 2018-Ohio-163, ¶ 1, 22, 24, and 29 (8th Dist.) (11-year-old charged with GSI where he was unrelated to the victim and improper touching occurred when the two were playing a game; GSI convictions affirmed; rape conviction reversed); *In re A.M.*, 2021-Ohio-432, ¶ 2 and 6 (3d Dist.) (juvenile pled no contest to GSI and importuning based on sexual contact with a minor child who was a neighbor); *In re T.D.H.*, 2018-Ohio-5277, ¶ 1 and 7-10 (2d Dist.) (juvenile adjudicated delinquent for rape and GSI. At the time, the juvenile was staying with his mother's friends, and he and the victim were playing basketball in the basement. The victim's father was

home at the time; judgment affirmed). Again, these charges and findings of delinquency were made in connection with a statute containing the same "no persons" language as R.C. 2919.22(B).

**{¶ 37}** While we have found R.C. 2919.22 unambiguous, we also note it would be illogical for the legislature to punish improper juvenile sexual touching while allowing juveniles to compel other minors to send them pictures of their genitals or participate in production of obscene materials. Accordingly, the first assignment of error is overruled.

## III. Extortion

**{¶ 38}** K.C.'s second assignment of error states that:

The Trial Court Erred When It Determined That Defendant-Appellant

Is a Delinquent Child, Under Count 2, Pursuant to O.R.C. § 2152.02(E),

O.R.C. § 2905.11(A)(5), and O.R.C. § 2905.11(B).

**{¶ 39}** Under this assignment of error, K.C. first argues that the State failed to present sufficient evidence to establish that he had committed extortion. According to K.C., the two parties were formerly boyfriend and girlfriend, and E.R. was simply "being playful and offering her own sexual advances instead of stating her distaste or distress over the request for a nude photo."   Appellant's Brief, p. 11.

**{¶ 40}** As noted, the trial court also found K.C. delinquent for extortion under R.C. 2905.11(A)(5). Interim Order at p. 3-5. R.C. 2905.11 states, in relevant part, that: "(A) No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall do any of the following: . . . (5) Expose or threaten to expose

any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute, or to impair any person's credit." The statute further provides that "[a]s used in this section, 'threat' includes a direct threat and a threat by innuendo." R.C. 2905.11(C).

**{¶ 41}** Like other courts, in analyzing sufficiency of the evidence in juvenile cases, we have used standards taken from adult criminal cases. *E.g., In re A.H.*, 2015-Ohio-2174, ¶ 24 (2d Dist.). "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 2007-Ohio-2133, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We remarked in *Cherry* that:

> The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

*Id.* at ¶ 9.

**{¶ 42}** Having reviewed the adjudication hearing transcript, we conclude the trial

court's judgment was supported by more than sufficient evidence. It is true that when the texting initially began, K.C. asked E.R. to send him a nude picture, and she responded, "only if you do it." Tr. at 47-48. To the extent that could be construed as initial consent (and that is doubtful for a number of reasons), it was immediately followed by many statements indicating that E.R. withdrew any consent, and she was threatened repeatedly that if she did not send such a picture, K.C. would share "moaning" videos of her that he had recorded without her consent.[3] Just before E.R. sent the photo, she told K.C. that she was literally being forced to do so, and he said, "yes, true." *Id.* at 58. In addition, she told K.C. immediately after sending the photo that: "I hate you, I hate you, I hate you, I hate you." *Id.* at 59.

{¶ 43} Here, there was not even any innuendo; K.C. made direct threats. " 'Threat' is defined in Webster's New Collegiate Dictionary, in part, as 'an expression of intention to inflict evil, injury or damage.' " *State v. McKissick*, 2008-Ohio-4856, ¶ 41 (8th Dist.). The matter involved in the threats here would obviously be humiliating and expose E.R. to contempt if released. In fact, the very prospect made her think about killing herself, and she tried do so a few days after the text conversation, by cutting her leg. Tr. at 80. A rational trier of fact, even without construing the evidence in the prosecution's favor, would have found the essential elements of extortion established.

{¶ 44} In finding K.C. delinquent on this charge, the trial court noted that even if it

---

[3] In this regard, E.R.'s initial reaction to the request for a nude photo was "what the hell." Shortly after, she stated, "only if you do it." *Id.* at 48. According to E.R., she never intended to send a nude photo. She said she asked K.C. to send her a photo because she was going to tell her mother and report it. In addition, E.R. only continued to talk to K.C. because she was scared due to his threats. Tr. at 73-74.

found that E.R. had initially given consent, she withdrew her consent, and K.C. was bound to accept that. Interim Order at p. 4-5. We agree.

{¶ 45} In the context of a rape case, we remarked that "[c]onsent is not an affirmative defense, but when applicable, consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion." *State v. Hartman*, 2016-Ohio-2883, ¶ 27 (2d Dist.), citing *State v. El-Berri*, 2008-Ohio-3539, ¶ 57 (8th Dist.). We recognized in *Hartman* that while two participants may begin an encounter on a consensual basis, if "consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant can be convicted if he or she fails to respect the change in consent." *Id.* at ¶ 32. Similarly, "[a] person who initially has consent to enter another's home may subsequently become a trespasser if consent is withdrawn." *State v. Stewart*, 2006-Ohio-1071, ¶ 20 (8th Dist.), citing *State v. Holloway*, 38 Ohio St.3d 239 (1988). The court stressed in *Stewart* that any permission the defendant had to enter was negated the moment the victim told him to leave. *Id.*

{¶ 46} In the case before us, it is abundantly clear that however E.R.'s initial remarks may be interpreted, she withdrew any consent. Nonetheless, K.C. persisted in threatening her until she finally capitulated and sent a nude picture. Accordingly, the trial court's decision was based on sufficient evidence.

{¶ 47} K.C.'s next claim is that the State failed to provide him with information about other devices Detective Cooper downloaded. He further asserts there may have been another device at issue because E.R. provided three different phone numbers during her testimony and there also may have been other messages from social media

that Cooper downloaded and failed to provide. Finally, K.C. argues that because he and E.R. had a past history together, old messages could provide a context for the court to make a proper decision.

**{¶ 48}** In arguing that the mistrial motion should have been granted, K.C. failed to cite any legal authority. Before analyzing his arguments, we will outline relevant standards.

**{¶ 49}** Decisions granting or denying motions for mistrial are reviewed for abuse of discretion. *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Additionally, "mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

**{¶ 50}** Under Crim.R. 16(L)(1), " '[t]he trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." "The purpose of the discovery rules 'is to prevent surprise and the secreting of evidence favorable to one party.' " *State v. Darmond*, 2013-Ohio-966, ¶10, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987). Sanctions for discovery rule violations are also reviewed for abuse of discretion. *Id.* at ¶ 20.

**{¶ 51}** " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *State v. Morris*, 2012-Ohio-2407, ¶ 14, quoting *AAAA Ents.,*

*Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). This type of review is deferential. "It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Id.*

{¶ 52} In assessing discovery violations, courts consider what are called the "*Parson* factors": "1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442 (1983), syllabus. In addition, the court, " 'when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery.' " *Id.* at ¶ 40, quoting *Lakewood* at paragraph two of the syllabus.

{¶ 53} The trial court did not discuss these factors because it did not find a discovery violation. We agree with this conclusion because K.C.'s arguments are not supported by the facts.

{¶ 54} As an initial matter, the text conversation took place in May 2024, when the parties were in eighth grade. They had ended their relationship a few days after starting seventh grade, which would have been well over a year and a half earlier. E.R. testified that she did not know why K.C. was messaging her in the first place, as they had not talked for months. Tr. at 21, 40-42, and 76. E.R.'s comment is supported by the fact that when K.C. asked to move from TikTok to private messaging, E.R. asked if that was "still"

his phone number, and K.C. said yes. *Id.* at 43.

**{¶ 55}** As an additional matter, during the hearing, E.R. was asked for her current phone number, which differed from the number that appeared on the text messages. *Id.* at 45. However, whether K.C. had more than one phone number was irrelevant, as she testified on cross-examination that she had not previously had any cell phone numbers other than the one that appeared on the text messages, and *more importantly*, she had only ever had one cell phone. *Id.* at 66. Therefore, she simply changed the number on the same phone. The other phone number E.R. mentioned was for her home phone, which was a landline. *Id.* at 62, 65-66, and 67. There was no indication that this phone had texting or any other relevant capability.

**{¶ 56}** As noted, the text conversation ended at 9:02 p.m. on May 11. After it ended, E.R. immediately asked her cousin and best friend what she should do. They told her to tell her mother, which she did 15 minutes later. At that point, E.R. gave her phone to her mother, who immediately called 911. Deputy Karn was dispatched and spoke with E.R. and her parents that evening. As noted, that evening, he collected E.R.'s phone and a tablet as well as the phone K.C. used and K.C.'s tablet. *Id.* at 7-11, 29, and 62. According to E.R., the means by which she had talked to K.C. had been on her home phone (the landline), her cell phone, and an iPad (which was the tablet the police took). *Id.* at 64.

**{¶ 57}** Detective Cooper testified that he was able to locate only one conversation between K.C. and E.R. on E.R.'s phone; nothing was found on the phone K.C. had used. Cooper did not provide any tablet contents to the prosecution, nor did he provide the

prosecution with the contents of E.R.'s phone, other than the May 11 conversation. Tr. at 31, 34, and 37. During Cooper's testimony, K.C.'s attorney requested a mistrial because Cooper had two phones and a tablet downloaded that the attorney had not reviewed. Counsel had not made a formal discovery request but said he had sent the State a standard letter. *Id.* at 34-35. In response, the prosecutor said that Cooper's and Karn's reports had stated that all relevant evidence had been turned over to the State; the prosecutor also said she had provided all relevant information she had to the defense attorney. Therefore, K.C.'s claim that other messages may have been provided to the State is simply incorrect. *See* Appellant's Brief at p. 12.

{¶ 58} The trial court also remarked that no standard discovery letter was in the file. At that point, defense counsel said he did not have the letter with him and that he would have to see if he even had a copy. The court then denied the mistrial motion but said it would certainly revisit it. *Id.* at 35-36. The court also subsequently questioned Cooper, who said he did not see any other text messages between K.C. and E.R., nor did he recall any Facebook messages or anything else on K.C.'s phone. *Id.* at 39.

{¶ 59} After trial, K.C. did not file a copy of the standard letter with the court, nor did counsel notify the court that he had found it. K.C. also did not ask the court to revisit its mistrial decision. One could conclude in this situation that counsel may not have sent the letter or that he chose not to ask the court to revisit the point. In any event, several days after the hearing, the court filed the adjudication order finding K.C. delinquent.

{¶ 60} In view of the above facts, we agree with the court's decision. In addition, conversations that occurred months before the incident had no relevance to what

occurred on May 11. We see no way in which such events would have provided "context" for the court, which was already aware E.R. and K.C. had a relationship more than a year and a half earlier. The relevant events were what took place on May 11. Again, as noted, once E.R. withdrew her "consent," if any, K.C. was required to abide by her withdrawal.

{¶ 61} Furthermore, contrary to K.C.'s claim, the text conversation was not even conceivably a "playful" interlude between two 13-year-old people. The transcript reveals that K.C. relentlessly pressured E.R. to send a nude photo to him, threatened to send humiliating information about her to a group of male students at her school if she did not comply, and admitted he had forced her to provide the photo. Correspondence during which an individual is threatening to kill herself is hardly playful and, as noted, E.R. did try to commit suicide a few days later. Finally, even if this were otherwise, the prosecutor turned over all information in her possession.

{¶ 62} Based on the preceding discussion, the second assignment is without merit and is overruled.

IV. Conclusion

{¶ 63} Both of K.C.'s assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.